# Exhibit GG

ORIGINAL

**FILED**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

JUN 15 2012

**U.S. COURT OF FEDERAL CLAIMS**

NeuroGrafix; Neurography Institute Medical
Associates, Inc.; and Image-Based Surgicenter
Corporation,

                    Plaintiffs,

        v.

United States of America,

                    Defendant.

Civil Action No.

**12-385 C**

## COMPLAINT

Plaintiffs, NeuroGrafix, Neurography Institute Medical Associates, Inc. ("NIMA"), and

Image-Based Surgicenter Corporation ("IBSC") (collectively, "Plaintiffs"), by counsel, bring this

action under 28 U.S.C. §§ 271, *et seq.* and 28 U.S.C. § 1498, against Defendant United States of

America ("Defendant") seeking recovery of Plaintiffs' reasonable and entire compensation, as

well as all other appropriate remedies, arising from Defendant's infringement of U.S. Patent No.

5,560,360 (the "'360 Patent") and Defendant's use, sale, and/or offer for sale, without license or

lawful right, of the inventions described in and covered by the '360 Patent.

## PARTIES

1.      Plaintiff NeuroGrafix is a California corporation with its principal place of

business located at 2716 Ocean Park Boulevard, Suite 3075, Santa Monica, California.

NeuroGrafix has never had more than 500 employees.

2.      Plaintiff NIMA is a California corporation with its principal place of business in

Santa Monica, California.  NIMA has never had more than 500 employees.

3.      Plaintiff IBSC is a California corporation with its principal place of business in

Santa Monica, California.  IBSC has never had more than 500 employees.

4.      Defendant United States of America is a defendant based on the practice of the

invention described in and covered by the '360 Patent by the hospitals and medical centers

administered by at least the following departments and agencies:

- Department of Defense, through at least the Department of the Army, Department of the Navy and the Department of the Air Force; and

- Department of Veterans Affairs, through at least the hospital and medical facilities it operates.

5. Defendant United States of America is also a defendant based on grants provided to others to practice the invention by at least the following departments and agencies:

- National Science Foundation;

- Department of Energy;

- Department of Defense, through at least the Department of the Army, United States Army Medical Research and Materiel Command, and Congressionally Directed Medical Research Programs;

- Department of Health and Human Services, through at least the National Institutes of Health including but not limited to the National Institute for Neurological Disorders and Stroke, the National Institute on Aging, the National Heart, Lung, and Blood Institute, the National Institute of Arthritis and Musculoskeletal and Skin Diseases, the National Institute of Biomedical Imaging and Bioengineering, the National Institute of Child Health and Human Development, the National Institute on Drug Abuse, the National Institute of General Medical Sciences, the National Institute of Mental Health, the National Institute on Deafness and Other Communication Disorders and the NIH Clinical Center, The National Center for Advancing Translational Science;

- Department of Homeland Security, through at least its Regional Visualization and Analytics Center (RVAC) Center of Excellence;

- National Aeronautics and Space Administration, through at least its Specialized Centers of Research; and

- Defense Advanced Research Projects Agency, through at least its Defense Sciences Office.

2

## JURISDICTION

6.  This Court has federal subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1491 and 1498.

## BACKGROUND

7.  Drs. Filler, Richards, Howe and Tsuruda conceived of the invention claimed in the '360 patent at least as early as July 1992. The invention was immediately recognized as a breakthrough, important invention. For example, Dr. John Mazziotta, then Chairman of Neurology at the University of California, Los Angeles ("UCLA"), sought to found an entire department at UCLA on the invention, the UCLA Department of Brain Mapping. Similarly, the chief magnetic resonance scientists at General Electric Company at the time, Bill Edelstein and Chuck Dumoulin, also immediately recognized the importance of the invention and eagerly questioned Dr. Filler's group on how to build magnetic resonance scanners to practice the invention. Indeed, the invention has resulted in over 10,000 scientific publications.

8.  To protect their invention, Dr. Filler and his colleagues sought patent protection. The '360 Patent, entitled "Image Neurography and Diffusion Anisotropy Imaging," issued on October 1, 1999. A true and correct copy of the '360 Patent is attached as Exhibit 1. The University of Washington, a public institution of higher education in the state of Washington, is the owner by assignment of the '360 Patent. Washington Research Foundation ("WRF") holds substantially all rights in the '360 Patent by exclusive license. WRF has in turn exclusively licensed substantially all rights in the '360 Patent to NeuroGrafix in December of 1998, retaining only certain potential reversion rights.

9.  NeuroGrafix is an exclusive licensee of the '360 Patent in the field of use of non-human, non-surgical medicine.

10. NIMA is an exclusive licensee of the '360 Patent in the field of use of human, non-surgical medicine.

11. IBSC is an exclusive licensee of the '360 Patent in the field of use of human, surgical medicine.

12.     Plaintiffs have a legal right to enforce their rights under the patent, sue for infringement, and seek all available relief and damages.

13.     Defendant has been and is now infringing the '360 Patent by, among other things, advertising, marketing, using, selling, and/or offering to sell products and services described in and covered by the '360 Patent, including without limitation, the performance of and provision of equipment and methods for peripheral nerve MR Neurography, diffusion anisotropy based tractography and Diffusion Tensor Imaging ("DTI"). Defendant has thereby marketed, used, sold, and/or offered for sale, without license or lawful right to do so, the invention described in and covered by the '360 Patent.

14.     Upon information and belief, Defendant continues to market, use, sell, and/or offer for sale the inventions described in and covered by the '360 Patent.

## COUNT I

(Infringement of U.S. Patent No. 5,560,360)

15.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 14 above, inclusive, as if fully repeated and restated herein.

16.     Defendant has infringed one or more claims of the '360 Patent, and continues to do so, by marketing, using, selling, and/or offering to sell products and services described in and covered by the '360 Patent, including without limitation, the performance of and provision of equipment and methods for peripheral nerve MR Neurography, diffusion anisotropy based tractography and DTI.

17.     Defendant's infringement of the '360 Patent, and its unauthorized marketing, use, sale and/or offer for sale of the invention described and covered by the '360 Patent, have caused and continue to cause Plaintiffs to suffer harm from the loss of its lawful patent rights to exclude others from making, using, selling, and being able to sell the patented invention.

18.     As a consequence of Defendant's actions, Plaintiffs are entitled to recover their reasonable and entire compensation arising from such infringement and unauthorized marketing,

4

use, sale and/or offer for sale of the patented inventions, and are entitled to other remedies as provided by relevant legal and equitable principles.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request the following relief:

1.    A judgment in favor of Plaintiffs and against Defendant on all of Plaintiffs' claims;

2.    A judgment in favor of Plaintiffs that Defendant has infringed the '360 Patent;

3.    A judgment and order requiring Defendant to pay Plaintiffs their  reasonable and entire compensation, in an amount to be proven at trial, for Defendant's infringement and unauthorized marketing, use, sale and/or offer for sale of the invention described and claimed in the '360 Patent;

4.    An accounting for damages suffered by Plaintiffs, including lost profits caused by Defendant's infringing activities, and judgment requiring Defendant to compensate Plaintiffs for such damage;

5.    An award of any costs, expenses and attorneys' fees to which Plaintiffs may be entitled; and

6.    Any and all other relief to which Plaintiffs may show themselves to be entitled.

Respectfully submitted,

June 15, 2012

COOPER & KIRK, PLLC

Vincent J. Colatriano
Counsel of Record

Of Counsel:

Marc A. Fenster
Alexander C.D. Giza
Andrew D. Weiss
Fredricka Ung
RUSS AUGUST & KABAT
12424 Wilshire Boulevard, 12th Floor
Los Angeles, CA 90025-1031
(310) 826-7474
(310) 826-6991 (facsimile)
mfenster@raklaw.com
agiza@raklaw.com
aweiss@raklaw.com
fung@raklaw.com

COOPER & KIRK, PLLC
1523 New Hampshire Avenue, NW
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (facsimile)
vcolatriano@cooperkirk.com


Attorneys for Plaintiffs,
NeuroGrafix; Neurography Institute Medical
Associates, Inc.; and Image-Based Surgicenter
Corporation

# Exhibit HH

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | |
|---|---|
| NEUROGRAFIX, et al. | * |
| | * |
| | * |
| Plaintiffs, | * |
| | * |
| v. | *    Civil Action No. 12-cv-02181-WMN |
| | * |
| THE JOHNS HOPKINS UNIVERSITY, et al., | * |
| | * |
| Defendants. | * |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## DEFENDANTS' MOTION TO DISMISS

Defendants, The Johns Hopkins University and The Johns Hopkins Hospital, by their attorneys, move to dismiss Plaintiffs' Complaint, pursuant to Federal Rule of Civil Procedure 12(b)(1), based on Plaintiffs' lack of standing and, as a result, this Court's lack of subject matter jurisdiction.  The grounds upon which Defendants base their Motion are contained in the attached Memorandum of Law which is incorporated by reference herein.

WHEREFORE, Defendants request that this Court enter an order dismissing

Plaintiffs' Complaint in its entirety and grant such other and further relief as the Court deems

appropriate.

Respectfully submitted,
_____/S/_____

Charles S. Hirsch (Fed Bar No.: 06605)
Ballard Spahr LLP
300 E. Lombard Street
18th Floor
Baltimore, MD  21202-3268
Telephone: 410.528.5600
Facsimile: 410.528.5650


Of Counsel:

William H. Needle
Katrina M. Quicker
Michael J. Riesen
Ballard Spahr LLP
999 Peachtree Street
Suite 1000
Atlanta, Georgia 30309
Telephone:  678.420.9300
Facsimile:    678.420.9301

Attorneys for Defendants

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 10th day of September, 2012, the Defendants'

Motion to Dismiss was filed and served electronically.

_____/S/_____
Charles S. Hirsch

# Exhibit II



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/012,388 | 08/10/2012 | 5560360 | 0288688.00141US1 | 3262 |

7590          09/11/2012

CHRISTENSEN, O'CONNOR,
JOHNSON & KINDNESS PLLC
1420 FIFTH AVENUE
SUITE 2800
SEATTLE, WA 98101

| EXAMINER |
|---|
| JASTRZAB, JEFFREY R |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3993 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 09/11/2012 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.



UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

MAILED

SEP 1 1 2012

CENTRAL REEXAMINATION UNIT

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

Wilmer Cutler Pickering Hale and Dorr, LLP

60 State Street

Boston, MA  02109

# *EX PARTE* REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO. *90/012,388*.

PATENT NO. *5560360*.

ART UNIT *3993*.

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified *ex parte* reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the *ex parte* reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).

| *Order Granting / Denying Request For Ex Parte Reexamination* | Control No. 90/012,388 | Patent Under Reexamination 5560360 |
|---|---|---|
| | Examiner JEFFREY R. JASTRZAB | Art Unit 3993 |

*--The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

The request for *ex parte* reexamination filed <u>10 August 2012</u> has been considered and a determination has been made. An identification of the claims, the references relied upon, and the rationale supporting the determination are attached.

Attachments: a)☐ PTO-892,      b)☒ PTO/SB/08,      c)☐ Other: _____

1. ☒   The request for *ex parte* reexamination is GRANTED.

   RESPONSE TIMES ARE SET AS FOLLOWS:

For Patent Owner's Statement (Optional):  TWO MONTHS  from the mailing date of this communication (37 CFR 1.530 (b)). **EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).**

For Requester's Reply (optional): TWO MONTHS from the **date of service** of any timely filed Patent Owner's Statement (37 CFR 1.535). **NO EXTENSION OF THIS TIME PERIOD IS PERMITTED.** If Patent Owner does not file a timely statement under 37 CFR 1.530(b), then no reply by requester is permitted.

2. ☐   The request for *ex parte* reexamination is DENIED.

This decision is not appealable (35 U.S.C. 303(c)).  Requester may seek review by petition to the Commissioner under 37 CFR 1.181 within ONE MONTH from the mailing date of this communication (37 CFR 1.515(c)). **EXTENSION OF TIME TO FILE SUCH A PETITION UNDER 37 CFR 1.181 ARE AVAILABLE ONLY BY PETITION TO SUSPEND OR WAIVE THE REGULATIONS UNDER 37 CFR 1.183.**

In due course, a refund under 37 CFR 1.26 ( c ) will be made to requester:

   a) ☐  by Treasury check or,

   b) ☐  by credit to Deposit Account No. _____, or

   c) ☐  by credit to a credit card account, unless otherwise notified (35 U.S.C. 303(c)).

cc:Requester ( if third party requester )
U.S. Patent and Trademark Office
PTOL-471 (Rev. 08-06)          Office Action in *Ex Parte* Reexamination          Part of Paper No. 20120829

# Decision Granting *Ex Parte* Reexamination

A substantial new question of patentability affecting claims 1, 3-6, 12, 13, 18-20, 23-25, 28, 34 and 35 of United States Patent Number 5,560,360 is raised by the request for *ex parte* reexamination.

Since requester did not request reexamination of claims 2, 7-11, 14-17, 21, 22, 26, 27, 29-33 and 36-66, and did not assert the existence of a substantial new question of patentability (SNQ) for such claims  (see 35 U.S.C. § 302); see also 37 CFR 1.510b and 1.515), such claims will not be reexamined. This matter was squarely addressed in *Sony Computer Entertainment America Inc., et al. v. Jon W. Dudas*, Civil Action No. 1:05CV1447 (E.D.Va. May 22, 2006), Slip Copy, 2006 WL 1472462. The District Court upheld the Office's discretion to not reexamine claims in a reexamination proceeding other than those claims for which reexamination had specifically been requested. The Court stated:

> "To be sure, a party may seek, and the PTO may grant, ...review of each and every claim of a patent. Moreover, while the PTO in its discretion may review claims for which ... review was not requested, nothing in the statute compels it to do so. To ensure that the PTO considers a claim for ... review, ...requires that the party seeking reexamination demonstrate why the PTO should reexamine each and every claim for which it seeks review. Here, it is undisputed that **Sony** did not seek review of every claim under the '213 and '333 patents. Accordingly, **Sony** cannot now claim that the PTO wrongly failed to reexamine claims for which **Sony** never requested review, and its argument that AIPA compels a contrary result is unpersuasive."

Application/Control Number: 90/012,388                                  Page 3
Art Unit: 3993

### *Substantial New Question*

The substantial new question of patentability (SNQP) is based on:

Middleton, et al., *MR Imaging of the Carpal Tunnel: Normal Anatomy and Preliminary Findings in the Carpal Tunnel Syndrome*, AJR 148:307-316 (February 1987) ("Middleton") (Exhibit B);

Mesgarzadeh, et al., *Carpal Tunnel: MR Imaging*, Radiology 171:749-751 (June 1989) ("Mesgarzadeh") (Exhibit C);

Rapoport, et al., *Brachial Plexus: Correlation of MR Imaging with CT and Pathologic Finding*s, Radiology 167:161 - 165 (1988) ("Rapoport") (Exhibit D)

Kneeland, et al., *Diagnosis of Diseases of the Supraclavicular Region by Use of MR Imaging*, AJR 148:1149-1151 (June 1987) ("Kneeland") (Exhibit E);

Tien: *Fat Suppressing MR Imaging in Neuroradiology*, AJR 158:369-379 (February 1992) ("Tien") (Exhibit F);

Felmlee et al., *Spatial Presaturation: A Method for Suppressing Flow Artifacts and Improving Depiction of Vascular Anatomy in MR Imaging*, Radiology 164:559-564 (1987) ("Felmlee") (Exhibit G); and

Hajnal et al., *MR Imaging of Anisotropically Restricted Diffusion of Water in the Nervous System: technical, Anatomic, and Pathological Considerations*, Journal of Computer Assisted Tomography, Jan/Feb 1991 (Exhibit H).

A discussion of the specifics now follows:

## Prosecution History in Brief

A review of the subject patent and the discussion in the Request on pages 6-11

reveals that MR imaging of the following nerves with the listed conspicuity was believed

to be absent in the art applied by the original Examiner:

> *"the prior art of record does not teach or reasonably suggest the inclusive*
>
> *subject matter of claim 89 which includes a method of using MRI to determine*
>
> *the shape and position of mammal tissue, wherein the mammal tissue is a nerve*
>
> <u>*consisting of a member from the group of peripheral nerves, cranial nerves*</u>
>
> <u>*numbers three through twelve, and autonomic nerves to provide a conspicuity of*</u>
>
> <u>*the nerve that is at least 1.1 times that of any adjacent non-neural tissue,*</u> *without*
>
> *the use of neural contrast agents."* (Page 3 of the Notice of Allowability dated
>
> April 16, 1996, emphasis added).

### Issues Raised by the Requester

The Requester states that a substantial new question of patentability under 35

U.S.C. §§ 102 and 103 is raised by the following combinations of references:

SNQ#1:  Middleton anticipates claims 1, 3-6, 12, 18, 19, 23-25, 28 and 34-35 of

the '360 patent under 35 U.S.C. § 102(b).

SNQ#2:  The combination of Middleton and Tien renders obvious claims 6, 12,

13 and 23 of the '360 patent under 35 U.S.C. § 103(a).

SNQ#3:  The combination of Middleton and Felmlee renders obvious claim 28 of

the '360 patent under 35 U.S.C. § 103(a).

SNQ#4: Mesgarzadeh anticipates claims 1, 3-6, 12, 18, 19, 23-25, 28 and 34-35 of the '360 patent under 35 U.S.C. § 102(b).

SNQ#5: The combination of Mesgarzadeh and Tien renders obvious claims 6, 12, 13 and 23 of the '360 patent under 35 U.S.C. § 103(a).

SNQ#6: In addition, the combination of Mesgarzadeh and Felmlee renders obvious claim 28 of the '360 patent under 35 U.S.C. § 103(a).

SNQ#7: Rapoport anticipates claims 1, 3-6, 12, 18, 19, 23-25, 28 and 34-35 of the '360 patent under 35 U.S.C. § 102(b).

SNQ#8: The combination of Rapoport and Tien renders obvious claims 6, 12, 13 and 23 of the '360 patent under 35 U.S.C. § 103(a).

SNQ#9: The combination of Rapoport and Felmlee renders obvious claim 28 of the '360 patent under 35 U.S.C. § 103(a).

SNQ#10: Kneeland anticipates claims 1, 3-6, 12, 18, 19, 23-25, 28 and 34-35 of the '360 patent under 35 U.S.C. § 102(b).

SNQ# 11: The combination of Kneeland and Tien renders obvious claims 6, 12, 13 and 23 of the '360 patent under 35 U.S.C. § 103(a).

SNQ#12: The combination of Kneeland and Felmlee renders obvious claim 28 of the '360 patent under 35 U.S.C. § 103(a).

SNQ#13: The combination of Middleton and Hajnal renders obvious claim 20 of the '360 patent under 35 U.S.C. § 103(a).

SNQ#14: The combination of Mesgarzadeh and Hajnal renders obvious claim 20 of the '360 patent under 35 U.S.C. § 103(a).

SNQ#15:  The combination of Rapoport and Hajnal renders obvious claim 20 of the '360 patent under 35 U.S.C. § 103(a).

SNQ#16:  The combination of Kneeland and Hajnal renders obvious claim 20 of the '360 patent under 35 U.S.C. § 103(a).


### Analysis of the Prior Art Provided in the Request

#### Middleton et al. and Mesgarzadeh:

It is agreed that the consideration of Middleton et al. or Mesgarzadeh raises a SNQP as to Claims 1, 3-6, 12, 18, 19, 23-25, 28 and 34-35 of the '360 Patent.

As pointed out in the request on pages 13, 14, 20 and 21, Middleton et al. and Mesgarzadeh both teach MR imaging of the median nerve, which is a peripheral nerve, the images distinguishing the nerve from surrounding tissue.

The teaching of MR imaging a peripheral nerve amounts to a new, non-cumulative technological teaching that was not previously considered and discussed on the record during the prosecution of the '360 patent.

Further, there is a substantial likelihood that a reasonable examiner would consider these teachings important in deciding whether or not these claims are patentable.

Accordingly, Middleton et al. and Mesgarzadeh raise a substantial new question of patentability as to Claims 1, 3-6, 12, 18, 19, 23-25, 28 and 34-35 which question has not been decided in a previous examination of the '360 Patent.

Application/Control Number: 90/012,388                                    Page 7
Art Unit: 3993

It follows from the above discussion that consideration of Middleton et al. or

Mesgarzadeh in combination with the fat suppression teaching of Tien, the teaching of

blood vessel suppression by Felmlee and the teaching of using diffusion weighted

gradients by Hajnal also raises a substantial new question for claims 6, 12, 13, 20, 23

and 28.


**Rapoport and Kneeland:**

It is agreed that the consideration of Rapoport or Kneeland raises a SNQP as to

Claims 1, 3-6, 12, 18, 19, 23-25, 28 and 34-35 of the '360 Patent.

As pointed out in the request on pages 27 and 35 Rapoport and Kneeland teach

MR imaging of the brachial plexus nerves, which are peripheral nerves, the images

distinguishing the nerves from surrounding tissue.

The teaching of MR imaging a peripheral nerve amounts to a new, non-

cumulative technological teaching that was not previously considered and discussed on

the record during the prosecution of the '360 patent.

Further, there is a substantial likelihood that a reasonable examiner would

consider this teaching important in deciding whether or not these claims are patentable.

Accordingly, Rapoport and Kneeland raise a substantial new question of

patentability as to Claims 1, 3-6, 12, 18, 19, 23-25, 28 and 34-35 which question has not

been decided in a previous examination of the '360 Patent.

It follows from the above discussion that consideration of Rapoport or Kneeland

in combination with the fat suppression teaching of Tien, the teaching of blood vessel

suppression by Felmlee and the teaching of using diffusion weighted gradients by

Hajnal also raises a substantial new question for claims 6, 12, 13, 20, 23 and 28.


### Issues Raised by the Requester Not Considered

It is noted that an issue not within the scope of reexamination proceedings has

been raised.  Requester asserts (Request pages 9-10) that the conspicuity limitation of

Claim 89 is indefinite under 35 U.S.C. § 112, 2nd paragraph.  The issue will not be

considered in a reexamination proceeding.  37 CFR 1.552(c).  While this issue is not

within the scope of reexamination, the patentee is advised that it may be desirable to

consider filing a reissue application provided that the patentee believes one or more

claims to be partially or wholly inoperative or invalid based upon the issue.


### *Service of Papers*

After the filing of a request for reexamination by a third party requester, any

document filed by either the patent owner or the third party requester must be served on

the other party (or parties where two or more third party requester proceedings are

merged) in the reexamination proceeding in the manner provided in 37 CFR 1.248.  See

37 CFR 1.550(f).


### *Waiver of Right to File Patent Owner Statement*

In a reexamination proceeding, Patent Owner may waive the right under 37

C.F.R. 1.530 to file a Patent Owner Statement.  The document needs to contain a

Application/Control Number: 90/012,388                                    Page 9
Art Unit: 3993

statement that Patent Owner waives the right under 37 C.F.R. 1.530 to file a Patent

Owner Statement and proof of service in the manner provided by 37 C.F.R. 1.248, if the

request for reexamination was made by a third party requester, see 37 C.F.R 1.550(f).

The Patent Owner may consider using the following statement in a document waiving

the right to file a Patent Owner Statement:


### WAIVER OF RIGHT TO FILE PATENT OWNER STATEMENT

Patent Owner waives the right under 37 C.F.R. 1.530 to file a Patent Owner Statement.


### *Extensions of Time*

Extensions of time under 37 CFR 1.136(a) will not be permitted in these

proceedings because the provisions of 37 CFR 1.136 apply only to "an applicant" and

not to parties in a reexamination proceeding.  Additionally, 35 U.S.C. 305 requires that

*ex parte* reexamination proceedings "will be conducted with special dispatch" (37

CFR 1.550(a)).  Extensions of time in *ex parte* reexamination proceedings are provided

for in 37 CFR 1.550(c).


### *Amendment in Reexamination Proceedings*

Patent owner is notified that any proposed amendment to the specification and/or

claims in this reexamination proceeding must comply with 37 CFR 1.530(d)-(j), must be

formally presented pursuant to 37 CFR 1.52(a) and (b), and must contain any fees

Application/Control Number: 90/012,388                                      Page 10
Art Unit: 3993

required by 37 CFR 1.20(c).  See MPEP § 2250(IV) for examples to assist in the

preparation of proper proposed amendments in reexamination proceedings.

### *Submissions*

In order to insure full consideration of any amendments, affidavits or declarations

or other documents as evidence of patentability, such documents must be submitted in

response to the first Office action on the merits (which does not result in a close of

prosecution).  Submissions after the second Office action on the merits, which is

intended to be a final action, will be governed by the requirements of 37 CFR 1.116,

after final rejection and by 37 CFR 41.33 after appeal, which will be strictly enforced.

### *Notification of Concurrent Proceedings*

The patent owner is reminded of the continuing responsibility under 37 CFR

1.565(a), to apprise the Office of any litigation activity, or other prior or concurrent

proceeding, involving Patent No. 5,560,360 throughout the course of this reexamination

proceeding.  Likewise, if present, the third party requester is also reminded of the ability

to similarly apprise the Office of any such activity or proceeding throughout the course

of this reexamination proceeding.  See MPEP §§ 2207, 2282 and 2286.

**All** correspondence relating to this *ex parte* reexamination proceeding should be
directed as follows:

By **U.S. Postal Service Mail** to:

    Mail Stop *Ex Parte* Reexam
    ATTN:  Central Reexamination Unit

Application/Control Number: 90/012,388                                      Page 11
Art Unit: 3993

> Commissioner for Patents
> P.O. Box 1450
> Alexandria, VA  22313-1450

By EFS:      Registered users may submit via the electronic filing system EFS-Web, at
             https://efs.uspto.gov/efile/myportal/efs-registered.

By FAX to:   (571) 273-9900
             Central Reexamination Unit

By hand to:  Customer Service Window
             Randolph Building
             401 Dulany St.
             Alexandria, VA  22314


For EFS-Web transmissions, 37 CFR 1.8(a)(1)(i) (C) and (ii) states that correspondence (except for a request for reexamination and a corrected or replacement request for reexamination) will be considered timely filed if (a) it is transmitted via the Office's electronic filing system in accordance with 37 CFR 1.6(a)(4), and (b) includes a certificate of transmission for each piece of correspondence stating the date of transmission, which is prior to the expiration of the set period of time in the Office action.

Any inquiry concerning this communication or earlier communications from the Reexamination Legal Advisor or Examiner, or as to the status of this proceeding, should be directed to the Central Reexamination Unit at telephone number (571) 272-7705.


/Jeffrey R. Jastrzab/
Jeffrey R. Jastrzab
CRU Examiner
AU 3993
(571) 272-4947


Conferee ___/BMF/_____

Conferee _____

# Exhibit JJ

RUSS, AUGUST & KABAT
Marc A. Fenster, State Bar No. 181067
Email: mfenster@raklaw.com
Alexander C.D. Giza, State Bar No. 212327
Email: agiza@raklaw.com
Andrew D. Weiss, State Bar No. 232974
Email: aweiss@raklaw.com
12424 Wilshire Boulevard, 12th Floor
Los Angeles, California 90025
Telephone: (310) 826-7474
Facsimile: (310) 826-6991

Attorneys for Plaintiffs
NEUROGRAFIX, NEUROGRAPHY
INSTITUTE MEDICAL ASSOCIATES, INC.,
IMAGE-BASED SURGICENTER CORPORATION

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| NEUROGRAFIX, a California corporation; NEUROGRAPHY INSTITUTE MEDICAL ASSOCIATES, INC., a California corporation; IMAGE-BASED SURGICENTER CORPORATION, a California corporation; WASHINGTON RESEARCH FOUNDATION, a not-for-profit Washington corporation, <br><br> vs. <br><br> THE REGENTS OF THE UNIVERSITY OF CALIFORNIA <br><br> GENERAL ELECTRIC COMPANY <br><br>      Intervener-Plaintiff, <br><br> vs. <br><br> NEUROGRAFIX; NEUROGRAPHY INSTITUTE MEDICAL ASSOCIATES, INC.; IMAGE-BASED SURGICENTER CORPORATION; WASHINGTON RESEARCH FOUNDATION, <br><br>      Defendants. | Case No. 2:11-cv-07591-MRP-RZ <br><br> **PLAINTIFFS' FIRST SUPPLEMENTAL DISCLOSURE OF ASSERTED CLAIMS AND INFRINGEMENT CONTENTIONS** <br><br> The Honorable Mariana R. Pfaelzer <br> United States District Court Judge |

RUSS, AUGUST & KABAT

3199-003 120605 Amended IC Disclosures.doc

1     In accordance with the Court's standard Case Management Order, Plaintiffs

2 Neurografix, Neurography Institute Medical Associates, Inc. and Image-Based

3 Surgicenter Corporation (collectively, "NeuroGrafix") provide the following First

4 Supplemental Disclosure of Asserted Claims and Infringement Contentions

5 relative to Defendant The Regents of The University of California (the "Regents").

6 Although NeuroGrafix believes its disclosures served on March 9, 2012, and

7 March 12, 2012, are sufficient and more than comply with its obligations,

8 NeuroGrafix has agreed to supplement its discloses in an attempt to address

9 concerns newly raised by third party intervener General Electric Company ("GE").

10     This disclosure is made solely for the purpose of this action. Discovery in

11 this matter has not yet begun. The Regents and GE have not yet produced any

12 documents and things, or provided any deposition testimony or other discovery in

13 this action. NeuroGrafix's investigation regarding these and other potential

14 grounds of infringement is ongoing. This disclosure is therefore based upon

15 information that NeuroGrafix has been able to obtain publicly, together with

16 NeuroGrafix's current good faith beliefs regarding the Accused Instrumentalities,

17 and is given without prejudice to NeuroGrafix's right to obtain leave to supplement

18 or amend its disclosure as additional facts are ascertained, analyses are made,

19 research is completed, and claims are construed.

20     These disclosures are based at least in part upon NeuroGrafix's present

21 understanding of the meaning and scope of the claims of U.S. Patent No. 5,560,360

22 (the "Filler Patent") in the absence of claim construction proceedings or discovery.

23 NeuroGrafix reserves the right to seek leave to supplement or amend these

24 disclosures if its understanding of the claims changes, including if the Court

25 construes them.

## I.    ASSERTED CLAIMS (¶ 3(A))

27     Based on the information presently available, NeuroGrafix states that the

28 Regents (and any of their predecessors in interest) infringe at least claims 36, 37,

RUSS, AUGUST & KABAT

39, 40, 41, 42, 43, 44, 46, 47, 49, 50, 51, 52, 53, 54, 63, 64, 65, and 66 of the Filler Patent, as shown by way of example in the claim chart served herewith in Exhibit A (the "Claim Chart"). The Regents directly infringe each of the claims pursuant to 35 U.S.C. § 271(a). For example, the Regents are directly infringing by its sale and offer for sale of the Accused Instrumentalities and by its use, testing and/or development of the Accused Instrumentalities in the United States. In the alternative and in addition, the Regents induce the infringement of the asserted claims pursuant to 35 U.S.C. § 271(b) and/or contributed to the infringement of the asserted claims pursuant to 35 U.S.C. § 271(c). *See* Section IV (¶ 3(D)) below. GE has been permitted to intervene in this case only as an indemnitor of the Regents. As a result, GE's liability in this case is derivative and only extends to its obligation to indemnify the Regents for its liability.

## II.     SPECIFIC ACCUSED INSTRUMENTALITIES (¶ 3(B))

Each of the Asserted Claims is infringed by the Regents' use of magnetic resonance hardware and software products capable of diffusion anisotropy imaging ("DAI"), diffusion tensor imaging ("DTI") and/or DTI tractography (the "Accused Instrumentalities"). Based on the information currently available to NeuroGrafix, the Regents use, sell, offer to sell or license, for example, the Accused Instrumentalities include the following magnetic resonance hardware and software products provided by Philips and GE: Philips Achieva 3.0T, Philips Achieva 1.5T, Philips Intera 1.5T, Philips Intera 3.0T, Philips Eclipse 1.5T, GE 1.5T SignaHDx, GE Signa LX, GE 1.5T Signa, GE 1.5T Signa Echospeed, GE 1.5T EXCITE HD, GE 3T Signa HD, GE 3T EXCITE, GE Signa Horizon 1.5T, GE Signa HDxt 1.5T, GE Discovery MR750 3.0T and related software including but not limited to DIRAC (Diffusion Imaging Reconstruction and Analysis Collection), DIVA (Diffusion Imaging Visualization Application), MiND (Metadata in NIfTI for DWI), DTI Studio and software written in house by the Regents and similar software. The Accused Instrumentalities also include the associated workstations

RUSS, AUGUST & KABAT

1  and the upgrade packages required for the MRI machines to perform DAI, DTI,

2  and/or DTI tractography including but not limited to additional workstations,

3  upgrade packages for the radio frequency (RF) and gradient subsystems, upgrade

4  packages for the multi-channel RF coil and any other hardware upgrades necessary

5  to upgrade an existing scanner to perform DAI, DTI, and/or DTI tractography.

6  The Accused Instrumentalities also include any additional non-Siemens hardware

7  and software used, sold, offered for sale or licensed by the Regents that performs

8  DAI, DTI and/or DTI tractography.

9      The identified Accused Instrumentality is based on the information currently

10 available to NeuroGrafix.  NeuroGrafix may amend and supplement this

11 disclosure, as well as the Claim Charts, as discovery in this matter proceeds.

12         **III.    CLAIM CHART (¶ 3(C))**

13     The Claim Chart, which identifies specifically where each element of each

14 asserted claim is found within each Accused Instrumentality, including the

15 corresponding function under 35 U.S.C. § 112 ¶ 6 where applicable, is attached as

16 Exhibit A.

17         **IV.    INDIRECT INFRINGEMENT (¶ 3(D))**

18     Based on the information presently available, NeuroGrafix believes that the

19 Regents directly infringe all of the asserted claims, as detailed in the Claim Chart.

20 In addition, the Regents are inducing or contributing to the direct infringement

21 detailed in the Claim Chart and the Complaint.

22     NeuroGrafix expressly reserves the right to amend or supplement this

23 response as the case progresses, including as NeuroGrafix learns additional

24 information through the discovery progresses and the Court issues its claim

25 construction ruling.

26         **V.    DOCTRINE OF EQUIVALENTS (¶ 3(E))**

27     Based on the information presently available, NeuroGrafix believes that

28 each claim is literally infringed.  If, however, the Regents are found to not be

RUSS, AUGUST & KABAT

3199-003 120605 Amended IC Disclosures.doc        3

literally infringing, NeuroGrafix believes that the Accused Instrumentalities infringe under the doctrine of equivalents. NeuroGrafix expressly reserves the right to amend or supplement this response as the case progresses, including as NeuroGrafix learns additional information through the discovery progresses and the Court issues its claim construction ruling.

## VI.    PRIORITY DATE (¶ 3(F))

The priority date to which each asserted claim is entitled is at least as early as March 9, 1992.

## VI.    WILLFUL INFRINGEMENT (¶ 3(G))

NeuroGrafix asserts that the Regents' infringement of the Filler patent has been willful.  The basis for this allegation is detailed in the Complaint.

## VII.    PRODUCTIONS PURSUANT TO PARAGRAPH 4

Pursuant to paragraph 4 of the Case Management Order, NeuroGrafix identifies the following:

- File History, ¶ 4(a):  NEURO78-666.
- Ownership documents, ¶ 4(b):  NEURO00017247-474, 17487-504, 17515-659.
- Status of Post Issuance Proceedings, ¶ 4(c):  *NeuroGrafix v. Oak Tree Medical Corporation*, Case No. CV 08-2923 CAS (JTLx) and *NeuroGrafix et al. v. Siemens Medical Solutions USA, Inc.*, Case No. 10-CV-1990 MRP (RZx) have been dismissed with prejudice.  There was no claim construction ruling in *Oaktree*.  The claim construction order from *Siemens* will be produced.  Furthermore, Reexamination Control No. 90/010,364, an ex parte reexamination filed December 18, 2008, was terminated by the United States Patent & Trademark Office during preprocessing on March 27, 2009.

RUSS, AUGUST & KABAT

PLAINTIFFS' FIRST SUPPLEMENTAL DISCLOSURE OF ASSERTED CLAIMS AND INFRINGEMENT CONTENTIONS

Dated: June 5, 2012

Respectfully submitted,

**RUSS AUGUST & KABAT**

By: ___/s/ Andrew D. Weiss_____
      Andrew D. Weiss

Marc A. Fenster, State Bar No. 181067
Email: mfenster@raklaw.com
Alexander C.D. Giza, State Bar No. 212327
Email: agiza@raklaw.com
Andrew D. Weiss, State Bar No. 232974
Email: aweiss@raklaw.com
RUSS, AUGUST & KABAT
12424 Wilshire Boulevard, 12th Floor
Los Angeles, California 90025
Telephone: (310) 826-7474
Facsimile: (310) 826-6991

Attorneys for Plaintiffs

NEUROGRAFIX, NEUROGRAPHY
INSTITUTE MEDICAL ASSOCIATES,
INC., IMAGE-BASED SURGICENTER
CORPORATION

RUSS, AUGUST & KABAT

# PROOF OF SERVICE

STATE OF CALIFORNIA

COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action; my business address is:  12424 Wilshire Boulevard, 12th Floor, Los Angeles, California 90025.

On June 5, 2012, I caused to be served the foregoing document described as **PLAINTIFFS' FIRST SUPPLEMENTAL DISCLOSURE OF ASSERTED CLAIMS AND INFRINGEMENT CONTENTIONS** on interested parties in this action.

☑ BY E-MAIL: I e-mailed the above referenced document to the addressees listed below:

| | |
|---|---|
| Carolyn C Chang<br>Jennifer Jane Johnson<br>Heather N Mewes<br>Fenwick & West LLP<br>555 California Street<br>San Francisco, CA 94041<br>415-975-2300<br>Fax: 415-281-1350<br>Email:  cchang@fenwick.com<br>Email:  jjjohnson@fenwick.com<br>Email:  hmewes@fenwick.com | *Attorneys for Defendant*<br><br>The Regents of the University of California |
| Bradley William Gunning<br>David T. McDonald<br>K&L Gates LLP<br>10100 Santa Monica Blvd., 7th Floor<br>Los Angeles, CA  90067<br>Tel: (310) 552-5000<br>Fax: (310) 552-5001<br>Email: brad.gunning@klgates.com<br>Email: david.mcdonald@klgates.com | *Attorneys for Co-Plaintiff*<br><br>Washington Research Foundation |
| Brian Martinez<br>Arnold & Porter LLP<br>777 South Figueroa Street<br>Forty-Fourth Floor<br>Los Angeles, CA 90017 | *Attorneys for Third Party Intervenor*<br><br>General Electric Company |

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on June 5, 2012 at Los Angeles, California.

RUSS, AUGUST & KABAT

PLAINTIFFS' FIRST SUPPLEMENTAL DISCLOSURE OF ASSERTED CLAIMS AND INFRINGEMENT CONTENTIONS

/s/ Andrew D. Weiss
Andrew D. Weiss

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

3199-003 120605 Amended IC Disclosures.doc          7

PLAINTIFFS' FIRST SUPPLEMENTAL DISCLOSURE OF ASSERTED CLAIMS AND INFRINGEMENT CONTENTIONS

# Exhibit KK

 UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
**www.uspto.gov**

_Ex Parte_ Reexamination Filing Data  -  June 30, 2012

1.   Total requests filed since start of _ex parte_ reexam on 07/01/81....................................12258[1]

|     |     |     |
| --- | --- | --- |
| a. | By patent owner | 3857 | 32% |
| b. | By other member of public | 8236 | 67% |
| c. | By order of Commissioner | 165 | 1% |

2.   Number of filings by discipline

| a. | Chemical Operation | 3309 | 27% |
| --- | --- | --- | --- |
| b. | Electrical Operation | 4663 | 38% |
| c. | Mechanical Operation | 4099 | 33% |
| d. | Design Patents | 187 | 2% |

3.   Annual _Ex Parte_ Reexam Filings

| Fiscal Yr. | No. | Fiscal Yr. | No. | Fiscal Yr. | No. | Fiscal Yr. | No. |
| --- | --- | --- | --- | --- | --- | --- | --- |
| 1981 | 78 (3 mos.) | 1989 | 243 | 1997 | 376 | 2005 | 524 |
| 1982 | 187 | 1990 | 297 | 1998 | 350 | 2006 | 511 |
| 1983 | 186 | 1991 | 307 | 1999 | 385 | 2007 | 643 |
| 1984 | 189 | 1992 | 392 | 2000 | 318 | 2008 | 680 |
| 1985 | 230 | 1993 | 359 | 2001 | 296 | 2009 | 658 |
| 1986 | 232 | 1994 | 379 | 2002 | 272 | 2010 | 780 |
| 1987 | 240 | 1995 | 392 | 2003 | 392 | 2011 | 759 |
| 1988 | 268 | 1996 | 418 | 2004 | 441 | 2012YTD | 476 |

4.   Number known to be in litigation..............…….……............... .3941……………32%

5.   Decisions on requests…………………………………………………………..11737

   a.  No. granted…………………………………………… 10755…………... 92%

|     |     |
| --- | --- |
| (1) | By examiner | 10633 |
| (2) | By Director (on petition) | 122 |

   b.  No. denied …………………………………………………982…………......8%

| (1) | By examiner | 947 |
| --- | --- | --- |
| (2) | Reexam vacated | 35 |

---

[1]Of the requests received in FY 2012, 24 requests have not yet been accorded a filing date, and preprocessing of 13 requests was terminated for failure to comply with the requirements of 37 CFR 1.510.  See Clarification of Filing Date Requirements for _Ex Parte_ and _Inter Partes_ Reexamination Proceedings, Final Rule, 71 Fed. Reg. 44219 (August 4, 2006).

6.   Total examiner denials (includes denials reversed by Director)……….......................1067

    a.   Patent owner requester                         493        46%
    b.   Third party requester                          574        54%

7.   Overall reexamination pendency (Filing date to certificate issue date)

    a.   Average pendency                        25.4 (mos.)
    b.   Median pendency                       19.6 (mos.)

8.   Reexam certificate claim analysis:

| | | Owner Requester | 3rd Party Requester | Comm'r Initiated | Overall |
|---|---|---|---|---|---|
| a. | All claims confirmed | 21% | 23% | 11% | 22% |
| b. | All claims cancelled | 9% | 12% | 23% | 11% |
| c. | Claims changes | 70% | 65% | 66% | 67% |

9.   Total *ex parte* reexamination certificates issued (1981 – present) ……………………….9090

    a.   Certificates with all claims confirmed        2000    22%
    b.   Certificates with all claims canceled       1037    11%
    c.   Certificates with claims changes         6053    67%

10.   Reexam claim analysis – requester is patent owner or 3rd party or Commissioner initiated.

    a.   Certificates – PATENT OWNER REQUESTER …………………………………….3148

        (1)  All claims confirmed             666    21%
        (2)  All claims canceled            279     9%
        (3)  Claim changes              2203    70%

    b.   Certificates – 3rd PARTY REQUESTER ……………………………………………...5823

        (1)  All claims confirmed         1322    23%
        (2)  All claims canceled         724    12%
        (3)  Claim changes          3777    65%

    c.   Certificates – COMMISSIONER INITIATED REEXAM …………..………....159

        (1)  All claims confirmed            18    11%
        (2)  All claims canceled          35    23%
        (3)  Claim changes          105    66%

# Exhibit LL

1  MICHAEL S. ADLER, State Bar No. 190119,
       madler@ta-llp.com
2  JOEL M. TANTALO, State Bar No. 216840,
       jtantalo@ta-llp.com.com
3  TANTALO & ADLER LLP
   9300 Wilshire Blvd, Suite 550
4  Beverly Hills, California 90212
   Telephone: (310) 734-8695
5  Facsimile: (310) 734-8696

6  Attorneys for Defendant
   JAY TSURUDA, MD

7

8                    UNITED STATES DISTRICT COURT

9          CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

10

11  NEUROGRAFIX, a California          Case No. CV 08-02923 CAS (JTLx)
12  corporation; WASHINGTON
    RESEARCH FOUNDATION, a not for     **AMENDED ANSWER AND**
13  profit Washington corporation,     **COUNTERCLAIM OF JAY**
                                        **TSURUDA, MD TO PLAINTIFFS'**
14                Plaintiffs,           **COMPLAINT**

15        v.                           **DEMAND FOR TRIAL BY JURY**

16  OAK TREE MEDICAL
17  CORPORATION, a California
    corporation; OAK TREE ASC, LLC, a
18  California limited liability corporation;
    JAY TSURUDA, M.D., an individual,
19
                  Defendants.
20

21  And related Cross-Action

22

23

24

25

26  .

27

28

Defendant Jay Tsuruda MD ("Dr. Tsuruda") answers the Complaint for Patent Infringement ("Complaint") of Plaintiffs Neurografix ("NGFX") and Washington Research Foundation ("WRF" and together with NGFX, "Plaintiffs") and counterclaims as follows:

## ANSWER

## JURISDICTION AND VENUE

1.     Dr. Tsuruda admits that Plaintiffs purport to file a patent infringement action under Title 35 of the United States Code but deny that there is any basis in law or fact for this action.  The allegation regarding subject matter jurisdiction contained in paragraph 1 of the Complaint is a legal conclusion for which no response is required.

2.     The allegation contained in the first sentence of paragraph 2 of the Complaint regarding the propriety of venue is a legal conclusion for which no response is required.  Dr. Tsuruda admits that he resides in this district.  Dr. Tsuruda is informed and believes and on that basis admits that defendants Oak Tree Medical Corporation and Oak Tree ASC, LLC ("The Oak Tree Defendants") reside in this district and have regular and established place(s) of business in this district.  Dr. Tsuruda denies the allegation contained in paragraph 2 of the Complaint that he has committed acts of infringement in this district.  Dr. Tsuruda is informed and believes that The Oak Tree Defendants have not committed acts of infringement in this basis and on that basis deny the allegation contained in paragraph 2 of the Complaint that they have committed acts of infringement in this district.

## PARTIES

3.     Dr. Tsuruda lacks knowledge and information sufficient to admit or deny the allegations contained in paragraph 3 of the Complaint, and on that basis denies them.

4.      Dr. Tsuruda lacks knowledge and information sufficient to admit or deny the allegations contained in paragraph 4 of the Complaint, and on that basis denies them.

5.      Dr. Tsuruda admits that Oak Tree Medical is a California corporation (in particular, a California professional medical corporation) with its principal place of business in Pasadena, California.  Dr. Tsuruda denies that Oak Tree Medical does business as Oak Tree Medical Imaging and/or Oak Tree Medical Center.

6.      Dr. Tsuruda admits that Oak Tree ASC is a California limited liability corporation with its principal place of business in Pasadena, California.  Dr. Tsuruda denies that Oak Tree ASC does business as Oak Tree Medical Imaging and/or Oak Tree Medical Center.

7.      Dr. Tsuruda admits he is an individual who resides in Los Angeles County, California.  Dr. Tsuruda admits that he works at Oak Tree Medical and Oak Tree ASC.

## COUNT 1

### INFRINGEMENT OF UNITED STATES PATENT NO. 5,560,360

8.      Dr. Tsuruda reasserts and incorporates by reference his responses to paragraphs 1 through 7 above.

9.      Dr. Tsuruda admits that Plaintiffs purport to assert a claim under the provisions of the patent laws of the United States and in particular 35 U.S.C. § 271 *et seq.* but denies that there is any basis in law or fact for such a claim.

10.      Dr. Tsuruda is informed and believes and on that basis admits that on October 1, 1996 the United States Patent and Trademark Office issued United States Patent Number 5,560,360 (the "'360 Patent") entitled "Image Neurography and Diffusion Anisotropy Imaging."  Dr. Tsuruda is informed and believes and on that basis admit that a true and correct copy of the '360 Patent is attached to the Complaint as Exhibit A.  Except as expressly admitted, Dr. Tsuruda denies the allegations contained in paragraph 10 of the Complaint.

1      11.    Dr. Tsuruda is informed and believes that the allegations contained in

2   paragraph 11 of the Complaint are true and on that basis admits them.

3      12.    Dr. Tsuruda lacks knowledge and information sufficient to admit or deny

4   the allegations contained in paragraph 12 of the Complaint, and on that basis denies

5   them.

6      13.    Dr. Tsuruda lacks knowledge and information sufficient to admit or deny

7   the allegations contained in paragraph 13 of the Complaint, and on that basis denies

8   them.

9      14.    Dr. Tsuruda admits that Oak Tree Medical and Tsuruda provide

10  peripheral nerve MRI imaging services.  Dr. Tsuruda denies all other allegations

11  contained in paragraph 14 of the Complaint as they relate to Dr. Tsuruda.  Dr. Tsuruda

12  is informed and believes that all other allegations contained in paragraph 14 of the

13  Complaint are not true as they relate to the Oak Tree Defendants and on that basis

14  denies those allegations.

15     15.    Dr. Tsuruda denies the allegations in paragraph 15 of the Complaint as

16  they relate to Dr. Tsuruda.  Dr. Tsuruda is informed and believes that the allegations

17  contained in paragraph 15 of the Complaint are not true as they relate to the Oak Tree

18  Defendants and on that basis denies those allegations.

19     16.    Dr. Tsuruda denies the allegations in paragraph 16 of the Complaint as

20  they relate to Dr. Tsuruda.  Dr. Tsuruda is informed and believes that the allegations

21  contained in paragraph 16 of the Complaint are not true as they relate to the Oak Tree

22  Defendants and on that basis denies those allegations.

23                        **RESPONSE TO PRAYER FOR RELIEF**

24     17.    Dr. Tsuruda denies that Plaintiffs are entitled to any relief sought in their

25  prayer for relief against Dr. Tsuruda, his agents and any other persons acting in

26  privity, concert or participation with Dr. Tsuruda.  Dr. Tsuruda has not infringed any

27  valid claim in the '360 Patent.  Plaintiffs are not entitled to have judgment entered

28  against Dr. Tsuruda nor to recover damages, including treble damages, attorney fees,

Tantalo & Adler
LLP

1  interest, and/or costs from Dr. Tsuruda. Plaintiffs' prayer should therefore be denied
2  in its entirety with respect to Dr. Tsuruda, and Plaintiffs should take nothing from Dr.
3  Tsuruda. Dr. Tsuruda asks that judgment be entered in his favor and that this action
4  be found to be an exceptional case entitling him to be awarded attorney's fees and any
5  other relief that this Court deems appropriate.

6                   **SEPARATE AND ADDITIONAL DEFENSES**

7         18.    Without assuming the burden to prove that which properly falls on
8  Plaintiffs, Dr. Tsuruda plead the following separate and additional defenses:

9  **FIRST SEPARATE AND ADDITIONAL DEFENSE - FAILURE TO STATE A**
10                              **CLAIM**

11        19.    Plaintiffs' Complaint fails to state a claim upon which relief can be
12  granted.

13        **SECOND SEPARATE AND ADDITIONAL DEFENSE – NON-**
14                          **INFRINGEMENT**

15        20.    Dr. Tsuruda does not infringe and have not infringed, either directly,
16  indirectly, contributorily, or by inducement, the '360 Patent, either literally or under
17  the doctrine of equivalents, willfully or otherwise.

18   **THIRD SEPARATE AND ADDITIONAL DEFENSE – PATENT INVALIDITY**

19        21.    Plaintiffs' purported claim for infringement of the '360 Patent is barred
20  because the '360 patent is invalid for failure to comply with the requirements of Title
21  35, United States Code, including, but not limited to, Sections 101, 102, 103, and/or
22  112. Among other things, Plaintiffs' claims are barred by pre-existing prior art and
23  the doctrine of obviousness.

24  **FOURTH SEPARATE AND ADDITIONAL DEFENSE – UNCLEAN HANDS**

25        22.    Plaintiffs' claims are barred in whole or in part by the doctrine of unclean
26  hands.

27
28

1

### FIFTH SEPARATE AND ADDITIONAL DEFENSE - LACHES

2      23.    Plaintiffs' claims are barred in whole or in part by the equitable doctrine

3  of laches.  Among other things, Plaintiffs and their predecessors-in-interest have

4  taught, published, and encouraged the use of the techniques that are claimed to be

5  covered by the patent-in-suit without informing third parties that such techniques were

6  allegedly subject to a patent.  Plaintiffs and their predecessors-in-interest have had

7  actual and/or constructive knowledge that third parties were practicing such

8  techniques and have not enforced any such alleged patent rights against such third

9  parties while such third parties have invested time, money, and effort into the practices

10  taught by the Plaintiffs and their predecessors in interest.

11

### SIXTH SEPARATE AND ADDITIONAL DEFENSE – PROSECUTION

12

### HISTORY ESTOPPEL

13      24.    Plaintiffs are estopped from construing the claims of the '360 patent in

14  such a way as to cover any of Dr. Tsuruda' products or practices by reason of

15  statements to the United States Patent and Trademark Office during prosecution of the

16  applications that led to issuance of the '360 patent and/or any other statements to the

17  United States Patent and Trademark Office.

18

### SEVENTH SEPARATE AND ADDITIONAL DEFENSE – EQUITABLE

19

### ESTOPPEL

20      25.    Plaintiffs' claims for relief are barred in whole or in part by the doctrine

21  of equitable estoppel.  Plaintiffs' claims are barred in whole or in part by the equitable

22  doctrine of laches.  Among other things, Plaintiffs and their predecessors-in-interest

23  have taught, published, and encouraged the use of the techniques that are claimed to

24  be covered by the patent-in-suit without informing third parties that such techniques

25  were allegedly subject to a patent.  Plaintiffs and their predecessors-in-interest have

26  had actual and/or constructive knowledge that third parties were practicing such

27  techniques and have not enforced any such alleged patent rights against such third

28

AMENDED ANSWER & COUNTERCLAIM OF DEFENDANT DR. TSURUDA

parties while such third parties have invested time, money, and effort into the practices taught by the Plaintiffs and their predecessors in interest.

### EIGHTH SEPARATE AND ADDITIONAL DEFENSE – INTERVENING RIGHTS

26.   Plaintiffs' claims for relief are barred in whole or in part by the doctrine of intervening rights.

### NINTH SEPARATE AND ADDITIONAL DEFENSE – TIME LIMITATION ON DAMAGES

27.   To the extent Plaintiffs seek damages for alleged infringement more than six years before the filing of the Complaint, recovery is barred by 35 U.S.C. § 286.

### TENTH SEPARATE AND ADDITIONAL DEFENSE – LIMITATION ON REMEDIES

28.   Plaintiffs' remedies are barred in whole or in part by 35 U.S.C. § 287.

### ELEVENTH SEPARATE AND ADDITIONAL DEFENSE – INEQUITABLE CONDUCT

29.   The '360 Patent is unenforceable on the basis of inequitable conduct, including but not limited to the use of this case to avoid the requirements of the pending California action between Neurographix and Dr. Tsuruda and the use of this case to attempt to prevent competition and/or the exercise of his profession by Dr. Tsuruda.

### TWELFTH SEPARATE AND ADDITIONAL DEFENSE – INJUNCTIVE RELIEF NOT WARRANTED

30.   Plaintiffs are not entitled to injunctive relief because any alleged injury to Plaintiffs is not immediate nor irreparable and Plaintiffs have an adequate remedy at law.

AMENDED ANSWER & COUNTERCLAIM OF DEFENDANT DR. TSURUDA

## THIRTEENTH SEPARATE AND ADDITIONAL DEFENSE – PATENT MISUSE

31.     Plaintiffs' claims are barred in whole or in part because Plaintiffs have engaged in patent misuse.

## FOURTEENTH AFFIRMATIVE DEFENSE – UNENFORCEABILITY

32.     Plaintiffs' purported claim for patent infringement of the '360 Patent is barred because the '360 patent is unenforceable on the grounds that the inventors, and their agents and assigns, committed inequitable conduct before the United States Patent and Trademark Office as alleged herein below.

## FIFTEENTH AFFIRMATIVE DEFENSE – LICENSE

33.     Plaintiffs' claim is barred in whole or in part on the ground that the Dr. Tsuruda has an express or implied license to the '360 Patent.

## SIXTEENTH AFFIRMATIVE DEFENSE – CONSENT & WAIVER

34.     Plaintiffs' claim is barred in whole or in part on the ground that Plaintiffs consented to Dr. Tsuruda's use of accused products or practices, and thus waived any claim for alleged infringement of the '360 Patent.

## SEVENTEENTH SEPARATE AND ADDITIONAL DEFENSE – ADDITIONAL DEFENSES

35.     Dr. Tsuruda has not knowingly or intentionally waived any applicable affirmative defense and reserves the right to raise additional affirmative defenses as they become known to him through discovery in this matter.  Dr. Tsuruda further reserves the right to amend his answer and/or affirmative defenses accordingly and/or to delete affirmative defenses that he determines are not applicable during the course of discovery.

///

///

///

1                     **COUNTERCLAIM**

2       36.     Defendant and Counterclaimant, Dr. Tsuruda, pleads the following

3 counterclaims against Plaintiffs and Counterclaim-Defendants NGFX and WRF.

4                     **THE PARTIES**

5       37.     Dr. Tsuruda is a resident of the county of Los Angeles, California and a

6 medical doctor licensed to practice medicine in the State of California.

7       38.     NGFX claims to be a California corporation with its principal place of

8 business in Santa Monica, California.

9       39.     WRF claims to be a not-for-profit corporation incorporated and existing

10 under the laws of the State of Washington.

11             **JURISDICTION AND VENUE**

12       40.     This Court has subject matter jurisdiction over this action pursuant to 28

13 U.S.C. §§ 1331 and 1338(a) because this action concerns a federal question relating to

14 patents arising under Title 35 of the United States Code, and pursuant to 28 U.S.C. §§

15 2201 and 2202 because this is a civil action for declaratory judgment.

16       41.     This Court has personal jurisdiction over NGFX and WRF by virtue of

17 their having submitted to the jurisdiction of this Court by filing the underlying

18 lawsuit.

19       42.     Venue is proper under 28 U.S.C. §§ 1391 and 1400.

20                 **COUNT ONE**

21     **FOR DECLARATORY JUDGMENT OF NON-INFRINGEMENT**

22       43.     Dr. Tsuruda incorporates by reference each of the allegations in

23 paragraphs 1 through 39 above and further alleges as follows:

24       44.     NGFX and WRF claim that the University of Washington is the owner of

25 U.S. Patent No. 5,560,360 (the "'360 Patent") entitled "Image Neurography and

26 Diffusion Anisotropy Imaging," and granted WRF an exclusive license and all

27 substantial rights under the '360 Patent.

28

Tantalo & Adler
LLP

AMENDED ANSWER & COUNTERCLAIM OF DEFENDANT DR. TSURUDA

45.    NGFX and WRF claim that pursuant to an agreement WRF granted to NGFX an exclusive license under the '360 Patent, including the right to enforce the '360 Patent and sue infringers for present and past infringement.

46.    NGFX and WRF further claim that Dr. Tsuruda has infringed and continues to infringe directly, indirectly, contributorily, and/or by inducement, the '360 Patent.

47.    Dr. Tsuruda denies that he has infringed or continue to infringe directly, indirectly, contributorily, and/or by inducement, any valid claim of the '360 Patent.

48.    As a result of the allegations of NGFX and WRF, and the responses of Dr. Tsuruda to those allegations, an actual and immediate justiciable controversy exists between the NGFX and WRF on one hand and Dr. Tsuruda on the other hand for which declaratory relief is appropriate.

49.    Dr. Tsuruda is entitled to judgment from this Court that he has not infringed the '360 patent.

## COUNT TWO

### FOR DECLARATORY JUDGMENT OF PATENT INVALIDITY

50.    Dr. Tsuruda incorporates by reference each of the allegations in paragraphs 1 through 49 above and further alleges as follows:

51.    Contrary to Plaintiffs' allegations, the '360 Patent is invalid under Title 35, United States Code, including, but not limited to, Sections 101, 102, 103, and/or 112. Among other things, Dr. Tsuruda asserts that some or all of the claims of the '360 patent are invalid for pre-existing prior art and/or obviousness.

52.    To resolve the legal and factual questions raised by Plaintiffs, and to afford relief from the uncertainty and controversy that Plaintiffs' allegations have precipitated, Dr. Tsuruda is entitled to a declaratory judgment that the '360 Patent is invalid.

53.    Dr. Tsuruda is entitled to judgment from this Court that he has not infringed the '360 patent, and that the '360 patent is invalid.

## COUNT THREE

### FOR DECLARATORY JUDGMENT OF PATENT UNENFORCEABILITY

54.     Dr. Tsuruda incorporates by reference each of the allegations in paragraphs 1 through 53 above and further alleges as follows:

55.     Patent applicants, including inventors, attorneys, and representatives, have a duty to deal with the United States Patent and Trademark Office ("USPTO") with candor, good faith, and honesty and to disclose to the USPTO all information that is known and may be material to the examination of the application.

56.     Patent applicants are deemed to breach their duties by making affirmative misrepresentation of material fact, failing to disclose material information, and/or submitting false material information to the USPTO.

57.     Dr. Tsuruda is informed and believes, and thereon alleges, that Dr. Filler, and his attorneys and representatives, breached the duties they owed to the USPTO with an intent to deceive, and by virtue of their conduct, committed inequitable conduct, rendering the '360 Patent unenforceable.

58.     The '360 Patent discloses and claims magnetic resonance imaging ("MRI") apparatus and methods used to display peripheral nerves in *in vivo* (living) mammal tissue such that the conspicuity of the neural tissue is at least 1.1 times that of the adjacent non-neural tissue. The '360 Patent also discloses and claims MRI apparatus and methods used to display peripheral nerves in *in vivo* mammal tissue so as to distinguish fascicles within the imaged nerve. The '360 Patent also describes various allegedly novel and preferred MRI scanner pulse sequences, including settings for TR, TE, T1- and T2-weighting, blood vessel suppression, and fat suppression. The '360 Patent also includes several figures depicting MR images that were allegedly generated using the purportedly novel claimed apparatus and/or methods.

59.     Dr. Tsuruda is informed and believes, and thereon alleges, that prior to the issuance of the '360 patent, Dr. Filler was informed that the MRI techniques described and claimed in the '360 patent and used to display neural tissue as having at

1   least 1.1 times the conspicuity of the adjacent non-neural tissue were in the prior art.

2   Indeed, the precise MRI techniques described and claimed in the '360 patent were

3   disclosed in various prior art references, including, but not limited to, the following

4   articles which appeared in leading industry publications: W. Middleton, et al.: *MR*

5   *Imaging of the Carpal Tunnel: Normal Anatomy and Preliminary Findings in the*

6   *Carpal Tunnel Syndrome*, American Journal of Radiology 148:307-316, February

7   1987 ("Middleton"), and S. Rapoport, et al.: *Brachial Plexus: Correlation of MR*

8   *Imaging with CT and Pathologic Findings*, Radiology 167:161-165, 1988

9   ("Rapoport"). Dr. Filler had access to and/or could have easily identified and obtained

10   copies of these material prior art references. Dr. Tsuruda is informed and believes,

11   and thereon alleges, however, that despite being placed on notice of the existence of

12   material prior art, Dr. Filler failed to take any steps to identify or ascertain the scope of

13   the prior art and/or failed to disclose these material prior art references to the USPTO.

14        60.   Dr. Tsuruda is informed and believes, and thereon alleges, that prior to

15   the issuance of the '360 patent, Dr. Filler was informed that the MRI techniques

16   described and claimed in the '360 patent and used to distinguish fascicles within an

17   imaged nerve were also in the prior art. Indeed, the precise MRI techniques described

18   and claimed in the '360 patent were disclosed in various prior art references,

19   including, but not limited to, Middleton and Rapoport. Dr. Filler had access to and/or

20   could have easily identified and obtained copies of these material prior art references.

21   Dr. Tsuruda is informed and believes, and thereon alleges, however, that despite being

22   placed on notice of the existence of material prior art, Dr. Filler failed to make any

23   efforts to ascertain the status of the prior art and/or failed to disclose the relevant prior

24   art references to the USPTO.

25        61.   Dr. Tsuruda is informed and believes, and thereon alleges, that prior to

26   the issuance of the '360 patent, Dr. Filler was informed that the MRI pulse sequences

27   disclosed and claimed in the '360 patent – including settings for TR, TE, T1- and T2-

28   weighting, blood vessel suppression, and fat suppression – were all in the prior art,

Tantalo & Adler
LLP

1   and indeed, were standard or "stock" settings on many MRI machines that were

2   commercially available prior to the critical date of the '360 Patent. Indeed, Dr.

3   Tsuruda is informed and believes, and thereon alleges, that the MRI pulse sequences

4   disclosed and claimed in the '360 patent were standard standard user-selectable

5   settings on the MRI machines available to Dr. Filler since before the critical date of

6   the '360 Patent. Dr. Tsuruda, however, is informed and believes, and thereon alleges,

7   that despite being placed on notice of the existence of material prior art, Dr. Filler

8   failed to take any steps to identify or ascertain the status of the prior art and/or failed

9   to disclose the material prior art references to the USPTO.

10        62.    Dr. Tsuruda is informed and believes, and thereon alleges, that prior to

11   the issuance of the '360 patent, Dr. Filler was informed that the images of a sciatic

12   nerve depicted in Figures 20-22 and on the face of the '360 Patent, and described in

13   cols. 27-28 of the '360 Patent, were all generated using standard prior art techniques

14   that had been used since before the critical date of the '360 Patent. Indeed, Dr.

15   Tsuruda is informed and believes, and thereon alleges, that the images depicted in

16   Figures 20-22 and on the face of the '360 Patent, and described in cols. 27-28 of the

17   '360 Patent, were all generated using techniques that were available to Filler since

18   before the critical date of the '360 Patent. Dr. Tsuruda is informed and believes, and

19   thereon alleges, however, that despite being placed on notice of the existence of

20   material prior art, Dr. Filler failed to take any steps to identify or ascertain the status of

21   the prior art and/or failed to disclose the material prior art references to the USPTO.

22        63.    Dr. Tsuruda is informed and believes, and thereon alleges, that Dr. Filler

23   failure's to take any steps, let alone reasonable efforts, to identify and ascertain the

24   scope of the prior art and Dr. Filler's failure to bring the information above to the

25   attention of the USPTO was intentional and performed in bad faith and with the intent

26   to deceive the Patent Examiner and to improperly secure allowance of the claims in

27   what matured into the '360 Patent. Moreover, the failures alleged above constituted a

28

pattern of misconduct by Dr. Filler to improperly secure patent rights on subject matter that was developed by others.

64. As a result of the acts and omissions described above, Dr. Filler committed inequitable conduct which renders the '360 Patent unenforceable.

## PRAYER FOR RELIEF

WHEREFORE, Dr. Tsuruda prays for judgment as follows:

a. That Plaintiffs take nothing by reason of their Complaint;

b. That judgment be entered in favor of Dr. Tsuruda;

c. That this Court make a declaration that Dr. Tsuruda has not infringed, directly, indirectly, contributorily, and/or by inducement, the '360 Patent;

d. That this Court make a declaration that the '360 Patent is invalid;

e. That this Court make a declaration that the '360 Patent is unenforceable;

f. That Dr. Tsuruda be awarded his costs incurred herein;

g. That this Court make a declaration that pursuant to 35 U.S.C. § 285 this is an exceptional case and that Dr. Tsuruda be awarded his attorney's fees incurred in connection with this action; and

h. For such other and/or further relief as this Court may deem just and proper.

Dated: November 10, 2008

TANTALO & ADLER LLP

By: _____
                    Michael S. Adler

Attorneys for Defendant and Counter-Claimant Jay Tsuruda

Tantalo & Adler
LLP

14

1

## JURY DEMAND

2
Dr. Tsuruda demands a trial by jury on all issues so triable.

3

4
Dated: November 10, 2008

**TANTALO & ADLER LLP**

5

6
By: _____

Michael S. Adler

7
Attorneys for Defendant and Counter-Claimant Jay
Tsuruda

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Tantalo & Adler
LLP

15

**AMENDED ANSWER & COUNTERCLAIM OF DEFENDANT DR. TSURUDA**

# PROOF OF SERVICE

I, Michael S. Adler, hereby certify as follows:

I am over the age of eighteen years and am not a party to this action.  My business address is 9300 Wilshire Blvd., Suite 550, Beverly Hills, California 90212-3223, in the County of Los Angeles.  I am a partner in the law firm Tantalo & Adler LLP and a member of the bar of this Court.  On November 10, 2008, I served the following:

1.  **AMENDED ANSWER AND COUNTERCLAIM OF JAY TSURUDA, MD TO PLAITNIFFS' COMPLAINT**

on the following individuals by the means stated:

| | |
|---|---|
| Michael L. Meeks, Esq.<br>Becky Hsaio, Esq.<br>Pepper Hamilton LLP<br>4 Park Plaza, Suite 1200<br>Irvine, CA 92614 | *Via First Class U.S. Mail*<br><br>Counsel for Plaintiff and<br>Counterdefendant Neurografix, Inc. |
| Erik N. Videlock, Esq.<br>Pepper Hamilton LLP<br>3000 Two Logan Square<br>Eigthteenth and Arch Streets<br>Philadelphia, PA 19103-2799 | *Via First Class U.S. Mail*<br><br>Counsel for Plaintiff and<br>Counterdefendant Neurografix, Inc. |
| Luke G. Anderson, Esq.<br>Kirkpatrick & Lockhart Preston Gates<br>Ellis LLP<br>1900 Main Street, Suite 600<br>Irvine, CA 92614-7319 | *Via First Class U.S. Mail*<br><br>Counsel for Plaintiff and<br>Counterdefendant<br>Washington Research Foundation |
| **David A Linehan<br>David T McDonald<br>Joseph M Preis**<br>K and L Gates LLP<br>925 Fourth Avenue Suite 2900<br>Seattle , WA 98104-1158 | *Via First Class U.S. Mail*<br><br>Counsel for Plaintiff and<br>Counterdefendant<br>Washington Research Foundation |

MICHAEL R. O'NEILL
JAMES W. HILL, MD, JD
McDERMOTT WILL & EMERY LLP
18191 Von Karman Avenue, Suite 500
Irvine, CA 92612-7108

*Via First Class U.S. Mail*

Counsel for Defendants and
Counterclaimants
Oak Tree Medical Corporation and
Oak Tree ASC, LLC

**George L Hampton , IV**
Hampton Holley LLP
2101 East Coast Highway
Suite 260
Corona Del Mar , CA 92625

*Via First Class U.S. Mail*

Counsel for Defendants and
Counterclaimants
Oak Tree Medical Corporation and
Oak Tree ASC, LLC

**Daniel T Shvodian**
**Richard J Burdge , Jr**
**Benjamin C Deming**
Howrey LLP
550 S Hope Street Suite 1100
Los Angeles , CA 90071

*Via First Class U.S. Mail*

Counsel for Third Party Defendant
Phillips Medical Systems North
America

John M. DiMatteo, Esq.
Eugene Chang
David D. Lee
Wilkie Farr and Gallagher LLP
787 Seventh Avenue
New York, N.Y. 10019-6099

*Via First Class U.S. Mail*

Counsel for Third Party Defendant
Phillips Medical Systems North
America

I certify under penalty of perjury that the foregoing is true and correct, that the foregoing document, and all copies made from same, were printed on recycled paper, and that this Certificate of Service was executed by me on November 10, 2008 at Beverly Hills, California.

Michael S. Adler

Tantalo & Adler
LLP

17

PROOF OF SERVICE

# Exhibit MM

*Rec'd in OGC 9/10/12*

AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### District of Massachusetts

| | | |
|---|---|---|
| NeuroGrafix, et al. | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.   2:11-cv-07591-MRP-RZ |
| The Regents of the University of California | ) | |
| | ) | (If the action is pending in another district, state where: |
| *Defendant* | ) | Central District of California                  ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:  The Brigham and Women's Hospital Inc., Attn: Office of General Counsel, 75 Francis Street, Boston, Massachusetts, 02115

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material: SEE ATTACHMENT A

| Place:  David S. Godkin, Esq.<br>Birnbaum & Godkin, LLP<br>280 Summer Street, Boston, MA 02210 | Date and Time:<br><br>09/21/2012 12:00 pm |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date:  _____

| | | |
|---|---|---|
| *CLERK OF COURT* | OR | |
| _____ | | _____ |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail, and telephone number of the attorney representing (*name of party*)     NeuroGrafix, et al.
_____ , who issues or requests this subpoena, are:

Fredricka Ung, Russ August & Kabat
12424 Wilshire Boulevard, 12th Floor, Los Angeles, California 90025
(310) 826-7474, fung@raklaw.com

AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.   2:11-cv-07591-MRP-RZ

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

This subpoena for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $     0.00     .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

## Federal Rule of Civil Procedure 45 (c), (d), and (e) (Effective 12/1/07)

**(c) Protecting a Person Subject to a Subpoena.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*

**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

**(i)** At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.

**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

**(A)** *When Required.* On timely motion, the issuing court must quash or modify a subpoena that:

**(i)** fails to allow a reasonable time to comply;

**(ii)** requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;

**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

**(iv)** subjects a person to undue burden.

**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:

**(i)** disclosing a trade secret or other confidential research, development, or commercial information;

**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or

**(iii)** a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial.

**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(d) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*

**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

**(i)** expressly make the claim; and

**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(e) Contempt.** The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

## INSTRUCTIONS

The following instructions are incorporated in "Schedule A" below.

1.      With respect to any document that you withhold on a claim of privilege, provide a statement, signed by one of your attorneys, setting forth as to each such document:

    (a)     The name(s) of the sender(s) and the author(s) of the document;

    (b)     The name(s) of the person(s) to whom the original or copies were sent;

    (c)     The date of the document;

    (d)     The date on which the document was received by those having possession of it;

    (e)     The statute, rule or decision which is claimed to give rise to the privilege; and

    (f)     A summary of the contents of the document without disclosing the matter that you claim is privileged.

2.      Whenever an objection is asserted to a particular request or portion thereof, please produce all responsive documents or parts thereof that are not subject to such objection.  Similarly, wherever a document is not produced in full, please state with particularity the reason or reasons it is not being produced in full, and describe, to the best of your knowledge, information and belief and with as much particularity as possible, those portions of the document which are not produced.

3.      Please produce documents in such a manner as will facilitate their identification with the particular request or category of requests to which they are responsive.  Specifically, produce documents in the same form, and in the same order that they existed prior to production; the documents are to be produced in the boxes, file, folders, or other containers in which the documents were found, and the titles, labels, or other descriptions of the documents are to be left intact.

4.      Pursuant to Rule 34(b)(1)(C) of the Federal Rules of Civil Procedure, Bright Response requests that documents be produced in the following formats:

   (a)     Excel documents should be produced in native format; and

   (b)     All other documents should be produced in electronic format (i.e. .pdf or TIFF), including the necessary load files with information including original file names, original file locations and extracted text (or OCR text if the extracted text is unavailable).

## DEFINITIONS

The following definitions are incorporated in "Schedule A" below.

1.      The term "document" includes "originals" and duplicates and has the same meaning as the term "writings and recordings" and "photographs" as defined in Rules 1001(1) and (2) of the Federal Rules of Evidence, whether or not claimed to be privileged against discovery on any ground, and specifically including, but not limited to, correspondence, agreements, and communications; dealer, customer, inter-company and intra-company communications; studies, surveys, reports, analyses or projections; announcements, declarations, notices, releases and publicity; telegrams; notes and memoranda; summaries; minutes and records of telephone conversations, meetings and conferences including lists of Persons attending meetings or conferences; summaries and records of personal conversations or interviews; financial records including bills, receipts, ledgers, invoices, bank statements and canceled checks; books, manuals, and publications; telexes or cables prepared, drafted, received or sent; calendars or diaries; charts, plans, sketches and drawings; photographs, reports, and/or summaries of investigations and/or surveys; opinions, notes and reports of consultants; opinions of counsel; reports and summaries of negotiations; any other reports or summaries; agreements, contracts, memoranda of understanding, letters of intent, licenses and assignments; brochures, pamphlets, catalogs, catalog sheets, advertisements (including promotional materials), fliers, announcements, posters, signs, story boards, and scripts;

audio and video recordings of radio and television commercials; circulars and trade letters; information contained in any computer tape, card, disc or program; and any other paper, writing or physical thing which contains the requested information.   Any documents that contains any comment, notation, addiction, deletion, insertion or marking of any kind, which is not part of another document, is to be considered a separate documents.

2.   "Communication" includes without limitation, communications by whatever means transmitted (i.e., whether oral, written, electronic, or other methods used), as well as any note, memorandum, correspondence or other record.

3.   The term "patent-in-suit" means United States Patent No. 5,560,360.

4.   The terms "you" or "your" means The Brigham and Women's Hospital Inc. and any of its present and former agents, officers, directors, employees, affiliates, investigators, trustees, consultants, advisors, accountants, attorneys and all other persons or entities acting or purporting to act on its behalf.

5.   The term "Plaintiffs" means NeuroGrafix, Neurography Institute Medical Associates, Inc., Image-Based Surgicenter Corporation and Washington Research Foundation and their officers, executives, employees, agents, attorneys, representatives, or other persons acting or purporting to act on their behalf.

6.   The term "The Regents" means The Regents of the University of California and its officers, executives, employees, agents, attorneys, representatives, or other persons acting or purporting to act on their behalf.

7.   The term "diffusion tensor imaging" means diffusion tensor imaging, high-angular-resolution diffusion imaging (also known as HARDI), Q-ball diffusion anisotropic imaging and tractography.

8.   The term "Software" refers to the Slicer and 3D Slicer software, available for download at http://www.slicer.org/.   The term also refers to all versions or upgrades of Slicer and 3D Slicer.

## SCHEDULE A
## DOCUMENT REQUESTS

**REQUEST FOR PRODUCTION NO. 1:**

Documents related to the Software, including manuals, specifications, user guides or other documentation for the Software.

**REQUEST FOR PRODUCTION NO. 2:**

Documents sufficient to show the design, structure, flow, features, characteristics, visual displays, operation and/or functionality of the Software, including pseudo-source code, source code documentation, planning documents and revision logs.

**REQUEST FOR PRODUCTION NO. 3:**

Source code for the Software.

**REQUEST FOR PRODUCTION NO. 4:**

Documents related to marketing, training materials and articles related to the Software, including but not limited to documents related using the Software for diffusion tensor imaging.

**REQUEST FOR PRODUCTION NO. 5:**

Documents related to any communications with The Regents (or its representatives), General Electric Company (or its representatives), Siemens Aktiengesellschaft (or its representatives) or Siemens Medical Solutions USA, Inc. (or its representatives) regarding Plaintiffs, Dr. Aaron G. Filler, '360 patent, the instant litigation or any of the Plaintiffs.

# Exhibit NN

# Exhibit OO

1   JUSTIN K. STRASSBURG – State Bar No. 238504
    STRASSBURG, GILMORE & WEI, LLP
2   600 S. Lake Ave., Ste. #305
3   Pasadena, California 91106
    Telephone: (626) 683-9933
4   Facsimile:  (626) 683-9944

**FILED**
Los Angeles Superior Court

A6029
90095

OCT 15 2010

JOHN A. CLARKE, CLERK

DEPT#53
(HON. JOHN P. SHOOK)
BY DAWN ALEXANDER, DEPUTY

5   Attorneys for Plaintiffs NEUROGRAFIX, IMAGE-
    BASED SURGICENTER CORPORATION,
6   INSTITUTE FOR NERVE MEDICINE MEDICAL
7   GROUP INC., CENTER FOR ADVANCED SPINAL
    NEUROSURGERY MEDICAL GROUP INC., and
8   NEUROGRAPHY INSTITUTE MEDICAL
    ASSOCIATES, INC.

9                **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

10                **COUNTY OF LOS ANGELES – CENTRAL DISTRICT**

11   NEUROGRAFIX; IMAGE-BASED           Case No.   **BC 447 518**
     SURGICENTER; INSTITUTE FOR
12   NERVE MEDICINE MEDICAL GROUP;
13   CENTER FOR ADVANCED SPINAL
     NEUROSURGERY MEDICAL GROUP;       **COMPLAINT FOR:**
14   NEUROGRAPHY INSTITUTE MEDICAL
     ASSOCIATES,                       **(1)   Inverse Condemnation**
15                                     **(2)   Denial of Due Process**
                                       **(3)   Denial of Equal Protection**
16            Plaintiffs,             **(4)   Trespass to Chattels**
          v.                          **(5)   Conversion**
17                                     **(6)   Unjust Enrichment**
     The REGENTS OF THE UNIVERSITY OF  **(7)   Misappropriation**
18   CALIFORNIA; Neil Martin, Chairman of **(8)   Unfair Competition**
     the Department of Neurosurgery, UCLA; **(9)   Negligence**
19   Does 1-20.
20
21            Defendants.
22
23
24
25
26
27
28

CITY/CASE: BC447518 LER/DEF#:
RECEIPT #:  CCH481620024
DATE PAID: 10/15/10  10:02:18 AM
PAYMENT: $355.00
RECEIVED:
     CHECK:
     CASH:        355.00
     CHANGE:
     CARD:                0310

1

Complaint

1

2

3

4

5          Plaintiffs NeuroGrafix, Image Based Surgicenter Corporation, Neurography Institute

6    Medical Associates, Inc, Institute for Nerve Medicine, and Center for Advanced Spinal

7    Neurosurgery ("Plaintiffs") allege inverse condemnation and torts by the Regents of the

8    University of California in relation to US Patent 5,560,360 (a true and correct copy of which is

9    attached as Exhibit A) as follows:

10                                  **THE PARTIES**

11         1.      Plaintiff NeuroGrafix ("NGFX") is a California lay corporation with its principal

12   place of business in Santa Monica, California. NeuroGrafix supports medical data transport,

13   serves as a management services organization for certain medical practices, and markets and

14   promotes certain medical procedures and apparatus covered by the '360 Patent, supervises and

15   receives an inexorable flow of income from it various sub-licensees, and conducts research and

16   development activities in the field of magnetic resonance imaging methods for the visualization

17   of nerves, neural tracts and other tissues and substances demonstrating the property of diffusional

18   anisotropy.

19         2.      Plaintiff Image-Based Surgicenter Corporation ("IBSC") is a California lay

20   corporation with its principal place of business in Santa Monica, California. IBSC operates

21   clinical facilities for image-guided surgical procedures and sells surgical suites incorporating MRI

22   guidance based on imaging technology covered by the '360 patent wherein the image data is

23   obtained so as to be usable for direct surgical or interventional service as defined and set forth in

24   the body of the specification and claims of the '360 patent. These are uses for imaging in which

25   the collection of images is integral to the completion of a surgical or interventional procedure.

26         3.      Plaintiff Institute for Nerve Medicine Medical Group Inc. ("INM") – a dba for

27   Aaron G. Filler, MD, PhD, APC - is a California professional corporation holding a medical

28   license, with its principal place of business in Santa Monica, California.  INM is a neurosurgical

-2-

1   practice which provides professional clinical surgical services relying on guidance by imaging

2   technology covered by the '360 patent wherein the image data is obtained so as to be usable for

3   direct surgical intervention as defined and set forth in the body of the specification and claims of

4   the '360 patent where no vector processing is required in the professional service. These are uses

5   for imaging in which the collection of images is integral to the completion of a surgical or

6   interventional procedure.

7          4.     Plaintiff Center for Advanced Spinal Neurosurgery Medical Group Inc. ("CASN")

8   is a California professional corporation holding a medical license, with its principal place of

9   business in Santa Monica, California.  CASN is a neurosurgical practice which provides

10  professional surgical services relying on guidance by imaging technology covered by the '360

11  patent wherein the image data is obtained so as to be usable for direct surgical intervention as

12  defined and set forth in the body of the specification and claims of the '360 patent where vector

13  processing is required in the professional service. These are uses for imaging in which the

14  collection of images is integral to the completion of a surgical or interventional procedure.

15         5.     Plaintiff Neurography Institute Medical Associates, Inc. ("NIMA") is a California

16  professional corporation holding a medical license with its principal place of business in Santa

17  Monica, California.  NIMA provides clinical diagnostic radiology services as defined under Stark

18  Law (42 U.S.C. § 1395nn; 42 C.F.R. §§ 411.350-411.389) by distinction from surgical services

19  including both facility and professional services relying on imaging technology covered by the

20  '360 patent wherein the image data is obtained so as to be usable only for diagnostic use as

21  defined and set forth in the body of the specification and claims of the '360 patent including both

22  the results of vector processing and non-vector processed aspects of the patent.

23         6.     Plaintiffs are informed and believe, and based thereon allege, that defendant

24  Regents of the University of California ("Regents"), is a public corporation and agency of the

25  State of California with the power to sue and be sued, that administers the University of

26  California, a public trust including the University of California Los Angeles (UCLA) Medical

27  Center (with components in Los Angeles and Santa Monica, California) , the University of

28  California San Francisco Medical Center (UCSF),  and the University of California San Diego

-3-

1  Medical Center (UCSD). The Regents is the employer of the faculty members at the various

2  University of California campuses including William Bradley who is an employee of the UCSD

3  Medical Group – a component of the Regents – and is the Chairman of the Department of

4  Radiology at UCSD, Cynthia Chin is an employee of the UCSF Medical Group – a component of

5  the Regents – and is a radiologist in the Department of Radiology at UCSF, and Gerhard Laub is

6  an employee of the UCLA Medical Group – a component of the Regents – and is also a research

7  scientist of Siemens Medical Solutions, USA. Defendant Regents is sued in its official capacity

8  only.

9      7.      Plaintiffs are informed and believe, and based thereon allege, that defendant Neil

10  Martin is an employee of the UCLA Medical Group – a component of the Regents – and is the

11  Chairman of the Department of Neurosurgery at UCLA. He is sued in his individual and official

12  capacities.

13

14  **VENUE**

15

16      8.      Regents have significant places of business in this District at Ronald Reagan

17  UCLA Medical Center - 757 Westwood Plaza, Los Angeles, California and also Santa Monica-

18  UCLA Medical Center - 1250 16th Street, Santa Monica, California. A significant portion of the

19  events that serve as the basis for this complaint took place within the Western Division of the

20  Central District of California. Therefore venue is appropriate.

21

22  **JURISDICTION**

23

24      9.      Regents is a component of the government of the State of California. The State of

25  California has waived its sovereign immunity for the causes that are the subject of this complaint

26  California Constitution, Article III, Section 5, Cal. Gov. Code Section 815, 818. The State of

27  California has not waived its claim to sovereign immunity for patent infringement and so cannot

28  be compelled to appear in Federal Court for infringement of patent rights. It has consistently

-4-

1   refused to appear in Federal Court to respond to complaints of patent infringement. It is the stated

2   intent of the United States Supreme Court that State remedies be applied in the resolution of cases

3   in which a State or State entity infringes upon intellectual property rights granted in a U.S. Patent.

4   For these reasons, the Superior Court of California has jurisdiction in this matter.

5         10.     The United States Supreme Court in 527 U.S. 627, 119 S.Ct. 2199, 144 L.Ed.2d

6   575 (1999) *"Florida Prepaid Postsecondary Education Expense Board, Petitioner v. College*

7   *Savings Bank and United States"* cites the concern: "by infringing a patent and then pleading

8   immunity to an infringement suit, a State not only infringes the patent, but deprives the patentee

9   of property without due process of law and "takes" the property in the patent without paying the

10  just compensation required by the Fifth Amendment" and Justice Rehnquist then comments:

11  "…Patents…have long been considered a species of property… As such, they are surely included

12  within the "property" of which no person may be deprived by a State without due process of

13  law." The United States Supreme Court has also previously confirmed the right of the University

14  of California to refuse to appear in Federal Court in matters of patent litigation *Regents of*

15  *University of California v. Genentech*, 119 S.Ct. 2388 (1999). The logic of Justice Rehnquist's

16  opinion in Florida Prepaid makes it clear that the subject matter of the current complaint is in the

17  jurisdiction of the Superior Court of the State of California.

18        11.     In the event that the California Superior Court requests transfer of this case to the

19  United States District Court, Central District – Western Division where a patent infringement

20  case is being tried involving NeuroGrafix against Siemens Medical Solutions and Siemens AG

21  (2:10-cv-01990-MRP -RZ), and if Regents agrees to appear in United States District Court, then

22  Plaintiffs allege infringement of US 5,560,360 under 35 USC §§ 271, et seq and allege that this

23  is an exceptional case with the meaning of 35 U.S.C. § 285, and justifying treble damages

24  pursuant to 35 U.S.C. § 284 and would seek leave to further amend the complaint to support the

25  Federal cause of action. However, if a transfer request is made, and the Regents exercises its

26  sovereign immunity and declines to appear in United States District Court, then this complaint

27  should be heard and tried in California Superior Court as currently pled.

28        12.     The Congress of the United States has taken the view that use of intellectual

-5-

1    property by the United States without permission of the owner is compensable  (*U.S.C Title 28,*

2    *Part IV, Chapter 91, § 1498*). A parallel to this view should be effective in the State of California

3    as well it is therefore the proper jurisdiction of the Superior Court of California to adjudicate the

4    taking of intellectual property by the Regents on behalf of the State of California.

5         13.     Preemption is intended to assure the rights of intellectual property and cannot be

6    asserted for the purpose of eliminating rights in intellectual property. The facts of the current case

7    show that the actions of the Regents threaten to destroy the very existence of the Plaintiffs

8    business in California and at least are alleged to have resulted in conversion – both standards of

9    liability that go beyond the requirements of the federal infringement laws but which do have a

10   place in the causes of action alleged in this complaint. Therefore there are violations of State of

11   California law resulting in the claimed takings and torts in this Petition that should rightly be

12   considered in the jurisdiction of the Superior Court of the State of California and should not be

13   considered as preempted by Federal Law.

14        14.     Since this property was validly held by Plaintiffs and since its existence could not

15   be challenged under the laws of the State of California during the periods of time alleged in this

16   complaint, even a subsequent successful challenge to the validity of the underlying patent by

17   some other party appearing in Federal Court would not void the liability of the Regents for their

18   failure to notify and to compensate under the laws of the State of California as they apply to

19   eminent domain and for this reason also this matter should be considered as under the current and

20   timely jurisdiction of the Superior Court of the State of California. The impact of this taking and

21   property damage upon the Plaintiffs is real and urgent and should be adjudicated on a present and

22   timely basis.

23        15.     The taking of intellectual property can be readily abated, the cost of termination is

24   not wasteful or oppressive, no privilege or public policy favors the continued taking – for these

25   reasons the taking and the related torts should be considered as continuing temporary acts, each

26   day giving rise to new tort and takings damage. There is therefore no supportable argument that

27   all of the takings and torts alleged are beyond any statute of limitation that might remove the

28   matter as a judicable controversy before the jurisdiction of the Superior Court of the State of

-6-

1    California.

2        16.    A copy of the patent and a warning that any further use was inconsistent with US

3    Patent 5,560,360 – along with a copy of the patent – and a direction on how to direct patients

4    needing this service to NIMA, were provided to Professor Neil Martin and to Dean Gerald Levey

5    of UCLA on November 21, 2008. This document is in substantial compliance with the

6    requirements of California Government Code, Section 910 for notification of the Regents of the

7    University of California. Plaintiff's address appears in the document including both email and

8    physical address. No response requesting any different form of notification or claim was received

9    within 45 days or at any time. The current filing is within two years of the November 21, 2008

10    notification and therefore meets the statutory requirements for filing of a claim under California

11    Government Code 945.6(a)(2).

12        17.    This controversy is ripe for adjudication. The Regents have previously

13    demonstrated that an attempt to file for patent infringement in Federal Court will elicit a series of

14    responses to appeal as high as the Supreme Court of the United States. The Supreme Court has

15    already ruled that Regents cannot be compelled to appear in Federal Court in a patent matter.

16    Plaintiff's respectfully submit that there is no need to repeat this process to exhaust Federal

17    remedies. The period for State of California response is drawing to a close with the elapse of

18    nearly two years since formal notification of the State having elicited no response.

19

20

21

22                   **GENERAL BACKGROUND**

23                   **Overview of Allegations**

24        18.    Plaintiffs bring this action against Defendants for inverse condemnation by

25    willfully and deliberately taking the intellectual property that is exclusively licensed to Plaintiffs,

26    trespassing upon this chattel patent US 5,560,360 (the '360 patent), causing conversion through

27    the diminishment of the sales value of the products generated by the method of the patent through

28    price erosion, unjust enrichment by billing private insurers and patients for services that Regents

1  were not entitled to offer, misappropriation of the intellectual property of Plaintiffs, and unfair

2  competition by taking advantage of its claim to sovereign immunity to avoid actions for patent

3  infringement.  In this matter, the actions of the State of California are particularly odious to the

4  legal system because the owner of this property is the State of Washington although the matter is

5  being brought to suit by Plaintiffs – exclusive holder of rights in the property. Because of this, the

6  interaction of its claim to sovereign immunity of the State of California before the courts of the

7  federal government has led to the seizure of this valuable income generating property so that

8  productive value of this property has been unlawfully diverted to take this income away from the

9  People of the State of Washington. Surely it is in the clear and evident interest of the People of

10  the United States of America that the Courts of the State of California duly carry out their duty to

11  assure just compensation for the financial damage to Plaintiffs and - through Plaintiffs – the

12  People of the State of Washington when the Regents – acting under their power as a component

13  of the government of the State of California - unjustly seizes property without thought of notice

14  or compensation – even if this action took place in consequence of the actions of a small number

15  of rogue government employees believing that they were acting on behalf of the public good of

16  the State of California.

17

18  **GENERAL BACKGROUND**

19  **Plaintiffs Invent, Develop and License US Patent 5,560,360**

20

21  19.     Aaron G. Filler, M.D., Ph.D., a named inventor of the '360 Patent and the CEO of

22  NeuroGrafix, and his co-inventors (the "Inventors") were granted the '360 Patent for their

23  invention in the field of imaging technology, including the Inventors' novel and unobvious

24  methods and apparatus for determining the shape, position, and orientation of mammalian tissues,

25  and particularly certain peripheral nerves and certain neural tracts in a living human body.

26  20.     Before Dr. Filler's and his colleagues' invention, the medical profession lacked a

27  way to clearly and reliably demonstrate the orientation of certain nerves and neural tracts in the

28  living human body, including in the brain itself.  Moreover, no one had ever satisfactorily imaged

-8-

1   the pathologies that selectively affect certain brain tracts or certain peripheral nerves.  Dr. Filler's

2   and his colleagues' invention has led to an entirely new generation of medical equipment,

3   diagnostic capabilities, and surgical procedures.  These new equipment and procedures provide

4   medical professionals with vastly improved means for locating, identifying, and tracking the

5   orientation of difficult-to-track biological structures within the human body, such as nerve tissues.

6   The revolutionary technology claimed and fully disclosed in the '360 Patent has directly led to,

7   and is the basis for, unprecedented advancements in the medical profession, including vastly

8   improved tools and techniques for diagnosing and treating patients having any of a plethora of

9   neurological injuries or disorders.  For instance, the claimed technology has been used in

10  connection with advanced treatment strategies for brain tumor surgery, and heretofore unfeasible

11  diagnostic methods relevant to amyotrophic lateral sclerosis ("ALS" or "Lou Gherig's disease"),

12  Alzheimer's disease, autism, epilepsy, multiple sclerosis, Parkinson's disease, and spinal cord

13  injuries.  In addition, the claimed technology has led to breakthroughs in significant non-

14  neurological medical problems such as the diagnosis of cardiac disease and the early screening of

15  prostate cancer and breast cancer.

16

17

18                             **FACTUAL ALLEGATIONS**

19            **Dr. Filler Co-Invents Revolutionary Imaging Technology**

20

21          21.     At the time the invention underlying the '360 Patent was conceived and reduced to

22  practice, many techniques were already known for locating and viewing the brain, spinal cord,

23  and spinal roots within the spinal cord.  But there were no satisfactory methods for viewing

24  structures such as the peripheral, autonomic, and cranial nerves (collectively, "the peripheral

25  nerves") in the diagnostic or surgical context.  The relatively small size of the peripheral nerves,

26  as well as their proximity to other tissue of comparable size, shape, or composition, made them

27  difficult to locate and identify.  By way of example, existing technology, such as angiography and

28  the use of contrast agents, could not satisfactorily be used to diagnose afflictions of the peripheral

                                           -9-

1  nerves.  Although MRI technology provided an opportunity to view certain structures such as the

2  peripheral nerves on a limited and unreliable basis, the existing methods were insufficient for

3  robust, comprehensive diagnostic or surgical use.  In addition, there was no known method

4  feasibly capable of visualizing the critically important neural tracts that make up the "white

5  matter" of the brain.

6       22.    In the early 1990s, the Inventors developed enhanced methods and apparatus that

7  could be used to image structures such as peripheral nerves generally and also anisotropic

8  structures within a patient (such as neural tract tissue in the brain).  To accomplish this, the

9  Inventors conceived of novel methods, including improved diffusion anisotropy-based MRI

10  techniques.  Significantly, the Inventors' techniques did not require injection of a contrast agent

11  into a patient to diagnose afflictions to biological tissue such as the peripheral nerves.

12       23.    Thus, the Inventors solved the problem of clearly visualizing the course of nerves,

13  neural tracts of the brain, and other structures in the living human body such as the fiber

14  architecture of the heart muscle.  The Inventors' technology, disclosed and claimed in the '360

15  Patent, would eventually revolutionize diagnostic, therapeutic, and surgical techniques that

16  require advanced knowledge of nerve and neural tract location.  Prior to the invention claimed in

17  the '360 Patent, medical practitioners could not clearly and reliably demonstrate the course of

18  nerves in the living human body, let alone detect and depict neural tracts in the brain for

19  diagnostic or surgical purposes.  Moreover, medical practitioners could not specifically image

20  pathologies that selectively affect certain brain tracts and certain nerves.  Indeed, applications of

21  the technology claimed in the '360 Patent have been the subject of nearly 4,000 peer reviewed

22  articles, most of which have been published in the past four years.

23

24  ### Dr. Filler and His Co-Inventors Are Awarded a U.S. Patent for Their Revolutionary

25  ### Imaging Technology

26       24.    On March 8, 1993, the Inventors filed United States Patent application No.

27  08/028,795 with the United States Patent and Trademark Office ("PTO"), disclosing the above-

28  identified invention.

-10-

1      25.    On October 1, 1996, the PTO duly and legally issued the '360 Patent, entitled

2  "Image Neurography and Diffusion Anisotropy Imaging."  In 1994, the technology disclosed in

3  the '360 Patent was assigned to the University of Washington ("UW") and UW, in turn, granted

4  the Washington Research Foundation ("WRF") an exclusive license to the technology disclosed

5  in the '360 Patent.

6      26.    Washington Research Foundation ("WRF") is a not-for-profit corporation

7  incorporated and existing under the laws of the State of Washington that hold substantially all

8  rights in the '360 patent and which has exclusively licensed substantially all rights in that patent

9  to NeuroGrafix in December of 1998, retaining only certain potential reversion rights.

10      27.    The novel imaging technology claimed in the '360 Patent encompasses several

11  practical applications including, but not limited to, magnetic resonance neurography ("MR

12  Neurography"), diffusion weighted neurography ("DW Neurography"), and diffusion tensor

13  imaging ("DTI").  Each practical application can be used to diagnose neurological conditions.

14  Each practical application is also useful to guide medical practitioners during sensitive

15  percutaneous and intraoperative procedures, such as the percutaneous needle biopsy of lesions or

16  the removal of brain tumors in portions of the brain that control speech, movement, and vision.

17      28.    Unless otherwise noted, Plaintiffs use the term "image" herein to mean the same

18  thing that the term means in the Field-of-Use provisions of the IBSC and NIMA sublicenses, *i.e.*,

19  interchangeably (i) the data sets produced by any of the claims of the '360 Patent and (ii) any

20  images derived from such data sets in accordance with the teachings of the '360 Patent.

21      29.    The '360 Patent has been relied upon by numerous examiners in the PTO as the

22  primary prior art reference in its field and has been cited by the PTO as critical in the PTO's exam

23  process for more than fifty subsequent patents in this field.  In a number of these cases, PTO

24  examiners have denied, rejected, or restricted claims by various other inventors by pointing out

25  that the relevant technology has already been invented and disclosed in the '360 Patent.

26

27          **Plaintiffs Practice the '360 Patent's Claims Under Exclusive Licenses**

28

-11-

30.     Dr. Filler and his co-inventors developed the technology claimed in the '360 Patent while Dr. Filler was affiliated with UW.  The '360 Patent duly issued to that university.

31.     UW subsequently granted all substantial rights in the '360 Patent to WRF, which was founded to help universities and other nonprofit research institutions in the State of Washington commercialize their technologies.  WRF's revenue is generated through licensing and investing activities, rather than through the development of technologies covered by the institutions it supports.

32.     Dr. Filler founded NeuroGrafix in 1998, shortly after the '360 Patent issued.  That same year, WRF granted NeuroGrafix all substantial rights in the '360 Patent pursuant to an exclusive license agreement (the "WRF-NeuroGrafix Agreement") .

33.     By 2000 at the latest, NeuroGrafix and its affiliates were commercially performing certain practical applications claimed in the '360 Patent, including MR Neurography. NeuroGrafix's 2002 business plan included an overview of the '360 Patent and its potential uses and applications, including the MR Neurography and DTI applications.  NeuroGrafix's business plan explained that MR Neurography applications revolutionize therapeutic techniques by making detailed depictions of peripheral nerves using the technology disclosed and claimed in the '360 Patent.  Consistent with the claims of the '360 Patent, NeuroGrafix's business plan also discussed the use of DTI to calculate the direction of nerves within a living organism and tracts in the brain by collecting anisotropic diffusion data. Gerhard Laub – in his capacity as a Siemens scientist while also an employee of the Regents - learned of the commercial interest of NeuroGrafix when he was consulted by colleagues at Siemens in regard to commercial evaluation of the technology by Siemens in 2004.

34.     As the scale of utilization of these technologies grew, in June of 2009, NeuroGrafix granted "field-of-use" sublicenses to IBSC, NIMA, INM and CASN. These sub-licenses respect the California Bar to the Corporate Practice of Medicine  (Cal. Bus. & Prof. Code §§ 2052, 2400) – as it pertains to physician ownership of corporations engaged in the employment of physicians for such tasks as supervision and analysis in the performance of the steps described in the specification and claims of the '360 patent,   Stark law (42 U.S.C. §

-12-

1395nn; 42 C.F.R. §§ 411.350-411.389) – as it pertains to the special regulatory treatment of diagnostic imaging, and other federal regulatory law as it pertains to separations between facility and services in surgical settings (42 C.F.R. § 414.40) .

## FACTUAL ALLEGATIONS

### Dr. Filler introduces the technology to UCLA

35.     In 1995, inventor Aaron Filler came to UCLA as a Spine Fellow and continued his prior research and development in the field of neural tract imaging. Subsequently in July of 1996, he became an Assistant Professor in Neurosurgery at UCLA. In October of 1996, the United States Patent Office granted US Patent 5,560,360 – Image Neurography and Diffusion Anisotropy Imaging. In November of 1996, C. Judson King, Provost and Senior Vice President of the University of California wrote to Dr. Filler to inform him that the President of the University of California – Richard C. Atkinson had informed Chancellor Charles E. Young and the Board of Regents about the major discovery that had been accomplished (see letter attached as Exhibit B). Regent  Frank W. Clark wrote to Dr. Filler in June of 1997 thanking Dr. Filler for a dramatic diagnosis and then successful nerve image guided surgery accomplished by Dr. Filler with Magnetic Resonance Neurography that constituted great value to the Regents (see letter attached as Exhibit C).

36.     Dr. Filler continued research and development, carefully recording and publishing academic peer reviewed reports based on all imaging cases performed. However, Neil Martin, - then the acting chairman of the Division of Neurosurgery at University of California - took a firm position that the advances and developments in US 5,560,360 did not merit further development. This led Dr. Filler to depart from the faculty UCLA and commence a private practice of medicine in May of 2001 to better assure the development of these technologies for the common good of patients throughout the world.

-13-

37.     Just prior to this induced departure, in March of 2001, the Office of the President of the University of California required Dr. Filler to assign another invention to the Regents. This invention – later granted as US 6,560,477 for magnetic resonance imaging of joints – cites the Neurography and DTI patent – US 5,560,360 – on its cover page. The Regents therefore understood well that US 5,560,360 defined certain intellectual property rights and that the Regents had no rights or license under US 5,560,360. They further understood that the MR Neurography technology represented a major technological advance.

38.     Neil Martin, MD, now the chairman of the Department of Neurosurgery had continued to maintain a public position that the developments in neural tract imaging disclosed by Dr. Filler and his coinventors in US 5,560,360 was not useful medically and should not be supported. Other UCLA radiologists such as John Benson and Leanne Seeger maintained a similar position at that time. In 2003, Dr. Martin attempted to block Dr. Filler from access to the research data generated by Dr. Filler at UCLA on the efficacy and utility of the technology. However, Dr. Filler retained access to the research data in consequence of his status of holding medical staff privileges at UCLA.

39.     In August of 2007,  Marshall Morgan, Chief of Staff of UCLA Medical Center wrote to Dr. Filler to unlawfully discontinue his medical staff membership based on a false allegation that Dr. Filler was not conducting a sufficient number of surgical procedures at UCLA to warrant continued medical staff membership. This action was reversed after review by the Regents. The reversal took place in consequence of a complaint against Neil Martin by Dr. Aaron Filler lodged with the Office of the President of the University of California in which Dr. Filler alleged that Neil Martin had placed the University of California at risk for Medicare compliance violations as part of an effort by Neil Martin to deny the existence of Dr. Filler's surgical activities at UCLA even while UCLA billed for those surgical services.

40.     The exclusive license agreement between the Washington Research Foundation and NeuroGrafix regarding US 5,560,360 contemplates a special role for any research that is a result of any collaboration with the University of Washington by its past or present employees that pertain to the (US 5,560,360) patent (Exclusive License Agreement, Clause 6.4). The

-14-

1    discontinuation of staff privileges would eliminate any potential for continued assertion of any

2    right for UCLA to use the technology for research on the basis of association with Dr. Filler.

3         41.    Shortly thereafter, in or around January of 2008 Dr. Martin apparently reversed his

4    opinion on the value and utility of the imaging techniques of MR Neurography and Diffusion

5    Tensor Imaging as disclosed in the '360 patent and launched a vigorous public marketing

6    program to promote the use of Dr. Filler's inventions by the Department of Neurosurgery at

7    UCLA, featuring DTI and/or Neurography on many of the pages of the UCLA Neurosurgery Web

8    Site (see UCLA web site pages attached as Exhibit D), further implying that these technologies

9    had been invented at UCLA. These became a centerpiece for the competitive marketing of

10   Neurosurgical services at UCLA on a nationwide and international scale undertaken in direct

11   purpose for the disruption and annihilation of the rightfully licensed activities of Dr. Filler's

12   associated entities in Santa Monica that are now the Plaintiffs in this lawsuit.

13        42.    In November of 2008, Dr. Martin again initiated action to discontinue Dr. Filler's

14   medical staff privileges and hence his access to provide surgery or conduct imaging at UCLA –

15   this time successfully. At this time, Dr. Filler, in his capacity as CEO of NeuroGrafix sent a cease

16   and desist notice to Dr. Neil Martin and to Dean Gerald Levey with a copy of the patent

17   demanding an immediate halt to the unlawful and uncompensated use of the intellectual property

18   of US 5,560,360 by UCLA.  Despite this warning, the Regents continued to intentionally and

19   repeatedly engage in taking of this property (see example of image and report from April of 2009

20   attached as Exhibit E).

21        43.    In December of 2008, Dr. Filler also became aware at that time through internet

22   searching that the Regents had commenced similar programs of aggressive taking in San

23   Francisco at UCSF under Dr. Cynthia Chin, and in San Diego at UCSD under Dr. William

24   Bradley.

25        44.    In all of its intentional takings, the Regents expended millions of dollars of

26   California State money to purchase specialized advanced MRI scanners from Siemens Medical

27   Solutions – whose scientist Gerhard Laub is also on the faculty at UCLA  - in order to perform

28   DTI imaging. However, although American College of Radiology guidelines show that DTI

-15-

1   services could have been billed and then paid for by patients who benefited (many of whom come

2   from out of state) or by their third party insurers, the Regents chose to give away DTI services

3   free of charge. This intentional persistent act of establishing a policy of giving away this valuable

4   advanced service for free in San Francisco, Los Angeles and San Diego resulted in a crushing

5   injury to the value and utility of the intellectual property of Plaintiffs. In this action, the Regents

6   poured millions of dollars of California State funds into taking advantage of an inverse

7   condemnation of private property as well as into predatory and unfair business practices. Dr.

8   William Bradley further informed Diagnostic Imaging Magazine that he was providing

9   information to Oak Tree Medical Center in what proved to be a failed attempt to attack the

10   validity of the patent.

## FIRST CAUSE OF ACTION

### FOR INVERSE CONDEMNATION UNDER CALIFORNIA CONSTITUTION

### ARTICLE I, Section 19, subdivision a

16       45.    Article I, section 19, subdivision (a), of the California Constitution permits

17   private property to be "taken or damaged for a public use . . . only when just

18   compensation . . . has first been paid to, or into court for, the owner." In this matter, the

19   existence of plaintiffs property rights was fully noticed to the Regents in 2001 so that any

20   eventual taking of the property cannot have been inadvertent or unknowing. Subsequently,

21   the Regents made no effort to obtain formal governmental approval for this taking. The

22   Regents made no attempt to provide notice of the taking to the State of Washington, the

23   University of Washington, the Washington Research Foundation or to Plaintiffs. Although

24   there may have been some use of the technologies at UCLA prior to 2008, these were

25   inherently unknowable to Plaintiffs which maintained exclusive right to use of this

26   property from December, 1998 onwards. Active, stable, and continuous use of the

27   property in such a way as to cause damage to the property rights of Plaintiffs by UCLA

28   began in early 2008. It is the posture of the United States of America that each act of

-16-

infringement is a separate offense and the laws of the State of California treat continuing temporary torts in the same way – this is the standard that should be applied. The Regents repeatedly took and damaged the Plaintiff's property with each act of infringement. The Regents clearly launched a formal program by the Department of Neurosurgery at UCLA to use and promote Neurography and DTI involving planning, marketing, promotion, pricing, billing, purchase and deployment of specialized software and equipment, and operation of the methods. Plaintiff suffered injury by the policy of UCLA to offer these services at far lower patient expense than the affiliates of NGFX could accomplish. It was able to underprice and damage NGFX by diverting public money of the State of California to subsidize its own expenses. Patients under the care of NGFX affiliates – such as the Institute for Nerve Medicine and the Neurography Institute were attracted away from those Santa Monica entities to have their services provided instead at Westwood and in Santa Monica by UCLA thus dispossessing NGFX of income from its affiliates' patients. Because Neil Martin, Gerhard Laub, Cynthia Chin and William Bradley were all well aware of the Plaintiff's business activity under US 5,560,360, they knew that the decision to offer the same patented services at a lower price in the immediate vicinity of the Plaintiff would directly take property from the Plaintiffs and damage that property still held by Plaintiffs.

46.     This action is unmistakably a use of the property by the State for purposes of producing income and serving a perceived public good and as such it is a possessory and confiscatory encroachment and not the result of any regulatory process. Although intellectual property is subject to nonrivalrous consumption, the aggressive underpricing and aggressive competitive online marketing carried out by UCLA significantly damaged even that portion of the property left to the Plaintiffs as well as damaging them by intervening and diverting the stream of income which should have been due to the inventor and holder of the rights in the intellectual property of US 5,560,360.

47.     In adopting the use and promotion of MR Neurography and DTI in knowing violation of Federal Law, the Regents acted without acted in excess of their lawful jurisdiction, acted prejudicially, arbitrarily, and capriciously, and abused their discretion. By subjecting

-17-

1  Plaintiffs property to such destructive pricing competition, the Regents assured that the Plaintiffs

2  could not possibly obtain investment to grow the value of their property nor could they effectively

3  provide services reflecting the actual cost and value of the services to the People of the State of

4  California. The result of the action of the Regents is therefore that they have deprived Plaintiffs'

5  property of a substantial segment of its value in California, rendering it virtually unmarketable as

6  a business and forbidding to a substantial degree much of the reasonable economic beneficial use

7  of the Property, in creation of a benefit to the public at the cost and expense of the Plaintiffs.

8  These actions constitute a real and *de facto* taking, without formal decision making approval by

9  the State of California, without notice, and without payment or just compensation, or any

10  compensation whatsoever, all in violation of Article I of the California Constitution, Section 7 –

11  assuring due process & equal protection in any taking of property and also Section 19 assuring

12  compensation.

13

14

15  **SECOND CAUSE OF ACTION**

16  **FOR DENIAL OF PROCEDURAL DUE PROCESS OF LAW;**

17  **ARTICLE I, SECTION 7 OF THE CALIFORNIA CONSTITUTION**

18      48.     Plaintiffs incorporate all allegations from paragraphs 1 through 47 above, as if set

19  forth herein in full.

20      49.     The Regents repeated the taking of Plaintiff's Property many times during 2008,

21  2009 and 2010, despite explicit awareness and notification by the Plaintiffs regarding Plaintiff's

22  property rights in US 5,560,360 without at anytime seeking a formal administrative process by

23  the State of California or even any formal process by the Office of the President of the University

24  of California or within any of the Universities at Los Angeles, San Francisco or San Diego to hear

25  and decide the matter of taking Plaintiff's Property in order to achieve some perceived public

26  good. This denied the Plaintiffs any opportunity for procedural due process to oppose these

27  actions.  The Regents had no lawful basis to abrogate the State of California process for deciding

28  to enact a taking of the Property of an individual.

-18-

50.     The Plaintiffs Property has been arbitrarily, capriciously, prejudicially, wrongfully, and unlawfully taken by the Regents to accommodate their goal of increasing patient numbers in their facilities as against not only Plaintiffs but as also against all other private providers of comparable health care services such as the University of Southern California or Cedars Sinai Medical Center or Stanford Medical Center who are forced to respect the laws of the United States of America regarding private property and who might have objected had any public hearing and formal decision making process been deployed. The Regents have acted without any legitimate purpose or power to support their actions.

51.     This denial of procedural due process of law violates the Constitution of the State of California, Article I, Section 7. As a direct and proximate result of the Regents conduct, Plaintiffs have been damaged in an amount to be determined at trial.

### THIRD CAUSE OF ACTION

### FOR DENIAL OF EQUAL PROTECTION OF LAWS UNDER CALIFORNIA

### CONSTITUTION, ARTICLE I, SECTION 7

52.     Plaintiffs incorporate all allegations from paragraphs 1 through 51 above, as if set forth herein in full.

53.     Under the Equal Protection clause of the California Constitution, Article I, Section 7, laws must treat similarly situated individual or groups similarly unless there is some rational basis for the adoption and enforcement of laws that establish different treatment.

54.     The Regents repeated the taking of Plaintiff's Property many times during 2008, 2009 and 2010, despite explicit awareness and notification by the Plaintiffs regarding Plaintiff's property rights in US 5,560,360 demonstrated an assumption that the Regents were entitled to treat the Plaintiffs as if they were not due the equal protections available to other property owners in the State of California.

55.     As a direct and proximate result of the Regents actions, Plaintiffs have suffered damages in an amount to be proven at trial.

-19-

1
2
3                                  **FOURTH CAUSE OF ACTION**
4                                 **FOR TRESPASS TO CHATTELS**
5        56.    Plaintiffs incorporate all allegations from paragraphs 1 through 55 above, as if set
6   forth herein in full.
7        57.    The actions of the Regents, repeated many times during 2009 and 2010, were
8   volitional in that they chose to offer these services in the full knowledge that this involved
9   unauthorized use of the plaintiffs property and in doing so, specifically intended to offer these
10  services to patients who would otherwise have sought care from one of the Plaintiffs, the
11  Plaintiffs being well known to the agents of the Regents and to the Regents in general. These
12  actions caused direct harm by loss of business, loss of business goodwill and severe price erosion
13  since Regents in many cases needlessly offered many of these valuable services for free on a
14  predatory basis to attract patients to the UCLA medical center for other expensive services –
15  despite the position of the American College of Radiology that DTI studies are billable as
16  independent studies and despite the fact that MR Neurography images are generally well
17  reimbursed by medical insurance. The Plaintiffs thereby suffered a serious and substantial
18  interference with their chattel – which by definition includes their patent rights.
19
20
21
22                                  **FIFTH CAUSE OF ACTION**
23                                  **FOR CONVERSION**
24       58.    Plaintiffs incorporate all allegations from paragraphs 1 through 57 above, as if set
25  forth herein in full.
26       59.    The actions of the Regents, repeated many times during 2009 and 2010, were
27  volitional in that they chose to offer these services in the full knowledge that this involved
28  unauthorized use of the plaintiffs property and in doing so, specifically intended to offer these

-20-

Complaint

1  services to patients who would otherwise have sought care from one of the Plaintiffs, the

2  Plaintiffs being well known to the agents of the Regents and to the Regents in general. These

3  actions caused direct harm by loss of business, loss of business goodwill and severe price erosion

4  since Regents in many cases needlessly offered these valuable services for free on a predatory

5  basis. The Plaintiffs thereby suffered a serious and substantial interference with and destruction of

6  part of the value of their chattel – which by definition includes their patent rights.

7

8

9

10

11  **SIXTH CAUSE OF ACTION**

12  **FOR UNJUST ENRICHMENT**

13       60.    Plaintiffs incorporate all allegations from paragraphs 1 through 59 above, as if set

14  forth herein in full.

15       61.    These actions, repeated many times during 2009 and 2010, enriched the Regents

16  on an invidious and calculated basis by attracting patients for high paying neurosurgical services

17  and imaging services on the basis of highly promoted DTI and Neurography who would have

18  otherwise sought these services at through affiliates of NeuroGrafix that paid royalties. Plaintiffs

19  NIMA, INM, CASN and IBSC had exclusive rights to the use of this intellectual property in their

20  respective fields of use. Because of the actions of the Regents, these Plaintiffs were directly

21  denied their rightful use of the property for business and therefore seek restitution.

22

23

24

25

26

27  **SEVENTH CAUSE OF ACTION**

28  **FOR MISAPPROPRIATION**

-21-

62.     Plaintiffs incorporate all allegations from paragraphs 1 through 61 above, as if set forth herein in full.

63.     The actions of the Regents, repeated many times during 2009 and 2010, were volitional in that they chose to offer these services in the full knowledge that this involved unauthorized use of the plaintiffs property and in doing so, specifically intended to offer these services to patients who would otherwise have sought care from one of the Plaintiffs, the Plaintiffs being well known to the agents and employees of the Regents and to the Regents in general. Through these intentional actions, and with no grant or permission from the Plaintiff who held the exclusive rights to use this intellectual property, the Regents took advantage of and made use of this intellectual property used the Plaintiff's property in order to promote the Regent's own financial and business purposes.

## EIGHTH CAUSE OF ACTION

## FOR UNFAIR COMPETITION UNDER BUSINESS AND PROFESSIONS CODE § 17200

64.     Plaintiffs incorporate all allegations from paragraphs 1 through 63 above, as if set forth herein in full.

65.     The actions of the Regents, repeated many times during 2009 and 2010, were volitional in that they chose to offer these services in the full knowledge that this involved unauthorized use of the plaintiffs property and in doing so, specifically intended to offer these services to patients who would otherwise have sought care from one of the Plaintiffs, the Plaintiffs being well known to the agents and employees of the Regents and to the Regents in general. These actions constituted unfair business practices because it gave the appearance that the Regents were a valid and appropriate source of the technology even though the Regents had no license to perform these services, did not employ the best known methods available from the Neurography Institute as disclosed in the patent, and therefore misleadingly subjected patients to inferior services.

-22-

1

2                              **NINTH CAUSE OF ACTION**

3                                **FOR NEGLIGENCE**

4        66.     Plaintiffs incorporate all allegations from paragraphs 1 through 65 above, as if set

5    forth herein in full.

6        67.     The actions of the Regents, repeated many times during 2009 and 2010,  were

7    negligent *per se* with regard to their duty to comply with the well known laws of the United

8    States of America. Dr. Neil Martin – as a Professor and Department Chairman at the University

9    of California - is fully aware of the US Patent system, particularly since US 6,560,477 (for MRI

10   imaging of joints) was filed by Dr. Filler, a member of his own Department and that patent –

11   assigned to the Regents - engaged the actions of the Office of the President of the University of

12   California. He was also very well aware that MR Neurography and Diffusion Tensor Imaging

13   were covered by US Patent 5,560,360 because Dr. Filler has presented a copy of this to Dr.

14   Martin, lectured about it at seminars at UCLA which Dr. Martin attended, and has specifically

15   explained the implications of the patent in response to a question directly about the patent by

16   Donald Becker, then Chairman of the Division of Neurosurgery at UCLA at a Department of

17   Surgery "Grand Rounds" lecture by Dr. Filler in April of 2001. Dr. Martin therefore had a clear

18   duty of care to behave in a lawful manner because of his knowledge. His decision to intentionally

19   violate the law – without first seeking any legal opinion that might have suggested he was

20   relieved of this duty - in order to retaliate against Dr. Filler under the protection of its claim to

21   sovereign immunity represents a reckless disregard for the law of the United States and it also

22   represents a negligent breach of a duty owed to the Plaintiffs for a minimal standard of care for

23   avoiding damage to the property of the Plaintiffs.

24       68.     Dr. William Bradley was consulted by Diagnostic Imaging Magazine in regards to

25   a challenge to validity against this patent by Oak Tree. He was therefore fully aware that Oak

26   Tree was at legal risk because of the validity of the patent in litigation by NeuroGrafix against

27   Oak Tree. He should therefore have known  that this patent was valid, that the intellectual

28   property rights were held by Plaintiffs, and that he should not make unauthorized use of the

                                            -23-

1    property. Nonetheless, Dr. Bradley continued to post on the internet instructions to others about

2    how to act to infringe the patent – thus inducing patent infringement by non-State entities which

3    damaged the value of the Plaintiff's property and also continued to use his position as an

4    employee of the State of California to assist the State of California in damaging the Plaintiff's

5    property.

6         69.    Dr. Bradley had sought patent protection for his own invention in the past – US

7    5,050,607 for a device placed in the rectum for MRI scanning of the prostate – and so fully

8    understood the implications of a valid US patent. He also understood that he had a duty of care as

9    an official of the State of California to respect the patent laws of the United States of America. On

10   November 11, 1996, Dr. Aaron Filler came to Long Beach Memorial Hospital at the invitation of

11   Dr. William Bradley and with Dr. Bradley in attendance, Dr. Filler explained the invention and

12   the newly granted patent. Between 1996 and 2008, Dr. Bradley never challenged the validity of

13   the patent.

14        70.    The Regents are well aware of patents and have taken advantage of the United

15   States Federal Court System to defend the validity of its own patents and to litigate against others

16   who may infringe the patents held by the Regents. In doing so, the Regents have been awarded

17   over $1 billion in damages paid by other entities making unauthorized use of the intellectual

18   property of the Regents. For this reason, the Regents are well aware of what enormous damage is

19   caused when one party makes unauthorized use of the intellectual property rights of another party.

20   Regents are fully aware and are fully prepared to demand large sums from other who do not take

21   adequate care to respect the intellectual property rights of the Regents. It is therefore clear that the

22   Plaintiffs had every reason to expect from the Regents a standard of care that would be exercised

23   by any reasonable prudent person under the same or similar circumstances to avoid or minimize

24   the risk of harm to the intellectual property of others. The Regents expect others to respect their

25   intellectual property. It is clear that others should expect the Regents to respect intellectual

26   property.

27        71.    The laws of the State of California that require entities such as the Regents to

28   respect intellectual property granted by the United States Patent Office have been considered and

-24-

1   expounded in detail by Eugene Volokh a Professor of Law at UCLA who published a detailed

2   formal legal treatise on this subject in the Southern California Law review and by Peter S. Menell

3   a Professor of Law at University of California at Berkeley who also has published a detailed

4   formal legal treatise on this subject in the Loyola Law Review. For this reason it can be fairly said

5   that Regents are also well aware that the laws of the State of California do protect intellectual

6   property even where its claim to sovereign immunity appears to relieve the Regents from the

7   obligation to appear to answer for its behavior in the Federal Courts of the United States of

8   America.

9        72.    Regents had a choice of either avoiding the use of Plaintiff's intellectual property

10   rights by sending their patients to facilities that had proper arrangements with the Plaintiff's, or

11   Regents could have easily made an arrangement allowing it to use the Plaintiffs' property rights

12   for commercial medical use if they so intended or desired. In not doing so, Regents made a

13   volitional reckless choice and acted in negligent disregard for Plaintiff's intellectual property

14   rights and in negligent disregard to a duty they understood well that calls upon the Regents to

15   respect intellectual property rights granted by the United States Patent Office.

16        73.    Regents were clearly in  a position to know they had a duty of reasonable care

17   owed to the Plaintiffs. The Regents clearly failed to exercise the necessary quantum of reasonable

18   care. Their breach of this duty constitutes negligence. Because the Regents have experienced over

19   a billion dollars of damage due to the infringement of their own patents, a reasonable person

20   would conclude that Regents must have understood that Regents could cause a billion dollars

21   worth of harm to some other inventor and that Regents would have no trouble foreseeing this risk.

22   A reasonable person would also expect that Regents, foreseeing the damage and knowing the

23   scale of the risk, would take reasonable measures to engage in alternative conduct that would

24   avoid the risk of harm to the Plaintiffs since such alternatives were readily available.

25        74.    Plaintiff's therefore allege that Dr. Martin, Dr. Bradley and the Regents owed a

26   duty to Plaintiff's to respect the Plaintiffs' valuable property rights, that Regents behaved

27   negligently, breaching that duty, that Plaintiffs suffered actual damage, and that Regents

28   negligence was the proximate cause of this damage.

-25-

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs ask the Court for the following relief:

As To The First Cause Of Action – Inverse Condemnation:

1.     For general damages in an amount according to proof at trial;

2.     Issue a preliminary injunction and permanent injunction against Defendants, prohibiting them, and their officers, agents, successors, employees representatives and any and all persons acting in concert with them from using technologies disclosed in US Patent 5,560,360 including MR Neurography, DW Neurography and Diffusion Tensor Imaging and so halting the continued taking of this property;

As To The Second Cause Of Action Denial of Due Process:

3.     For general damages in an amount according to proof at trial;

4.     Injunctive relief as in item 2 above.

As To The Third Cause Of Action Denial of Equal Protection:

5.     For general damages in an amount according to proof at trial;

6.     Injunctive relief as in item 2 above.

As To The Fourth Cause Of Action Trespass to Chattels:

7.     For general damages in an amount according to proof at trial;

8.     Injunctive relief as in item 2 above.

As To The Fifth Cause Of Action Conversion:

9.     For general damages in an amount according to proof at trial;

10.    Injunctive relief as in item 2 above.

-26-

1     As To The Sixth Cause Of Action Unjust Enrichment:

2     11.    For general damages and restitution in an amount according to proof at trial;

3     12.    Injunctive relief as in item 2 above.

4     As To The Seventh Cause Of Action Misappropriation:

5     13.    For general in an amount according to proof at trial;

6     14.    Injunctive relief as in item 2 above.

7     As To The Eighth Cause Of Action Unfair Competition:

8     15.    For general damages in an amount according to proof at trial;

9     16.    Injunctive relief as in item 2 above.

10     As To The Ninth Cause Of Action Negligence:

11     17.    For general damages in an amount according to proof at trial;

12     18.    Injunctive relief as in item 2 above.

13     As To All Causes Of Action:

14     19.    Damages are estimated to involve approximately 200 Neurography and DTI

15 imaging services per month totaling 6,600 imaging studies since January of 2008, each a separate

16 act and each lost to Plaintiffs. These services were offered by NIMA – which collected about

17 $3,000 per imaging study. Therefore the damage due to inverse condemnation and property torts

18 is about $19.8 million for diagnostic imaging. Additionally, surgical services requiring DTI for

19 guidance should have been performed by provider with proper rights under 5,560,360 but were

20 instead performed at UCLA through uncompensated property rights seizure further compromised

21 the Plaintiffs. Throughout this period, the Regents damaged the property by giving away many of

22 the valuable services for free while intensively marketing and providing the services in close

23 geographic proximity to the headquarters office of Plaintiffs in Santa Monica and also in Los

24 Angeles, and also in San Francisco and also in San Diego – all with an effect organized in such a

25 way as to have the potential to accomplish a complete destruction of the property of the plaintiffs

26 in the State of California. Therefore, Plaintiffs ask the Court for nominal, compensatory, special

27 and statutory damages in an amount according to proof, and treble damages to the extent

28 permitted by law.

-27-

20. For all applicable pre-judgment and post-judgment interest at the maximum legal rate;

21. For costs of the suit incurred herein including attorney fees; and

22. For such other and further relief as the court may deem proper.

Dated: October 5, 2010

STRASSBURG, GILMORE & WEI, LLP
JUSTIN STRASSBURG

By:_____
Justin Strassburg

Attorneys for Plaintiffs NEUROGRAFIX;
IMAGE-BASED SURGICENTER
CORPORATION; AARON G. FILLER, M.D.,
Ph.D. A PROFESSIONAL CORPORATION;
CENTER FOR ADVANCED SPINAL
NEUROSURGERY MEDICAL GROUP
INC.; and NEUROGRAPHY INSTITUTE
MEDICAL ASSOCIATES, INC.

-28-

Complaint